(No. 64113.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DREW TERRELL, Appellant.

*Opinion filed October 25, 1989.—Rehearing denied December 4, 1989.*

180

182

MILLER, joined by STAMOS, JJ., concurring in part and dissenting in part.

RYAN, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Peter L. Rotskoff, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley and Cecil A. Partee, State's Attorneys, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Inge Fryklund, Kevin Sweeney, Kathleen Warnick and Renee Goldfarb, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Drew Terrell, was charged by indictment with the murder and aggravated criminal sexual assault of 15-month-old Laura Hampton. Following a bench trial, the defendant was convicted of both crimes and the defendant's motion for a new trial was denied. The State then requested a death penalty hearing and the defendant elected to be sentenced by the court and not by a jury. At the sentencing hearing, the court found that the defendant was 18 years of age or older at the time of the offenses and that two of the aggravating fac-

tors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) were present. After hearing evidence in mitigation, the trial court concluded that there were no mitigating factors sufficient to preclude the imposition of death and sentenced the defendant to death. The death sentence has been stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

The issues for our review are: (1) whether the trial court erred in denying the defendant's motion to suppress his confession; (2) whether there was sufficient evidence to establish that the defendant had the requisite mental state to sustain a murder conviction; (3) whether the criminal sexual assault and aggravated criminal sexual assault statutes are constitutional; (4) whether the trial court's consideration of a victim impact statement requires a new sentencing hearing; (5) whether other alleged errors in sentencing require reversal of the defendant's death sentence; and (6) whether the trial court erred in ordering the defendant's death sentence and his 60-year extended sentence for aggravated criminal sexual assault to run consecutively. The defendant also asks that we reconsider prior decisions holding our death penalty statute constitutional.

At trial, the mother of the victim, Markeeter Hampton, testified that in August of 1985, she and her 15-month-old daughter, Laura Hampton, lived in an apartment with the defendant and the defendant's mother, Elizabeth Terrell. On the morning of August 27, 1985, Ms. Hampton went to work, leaving Laura with the defendant's mother, who was to baby-sit that day. Ms. Hampton testified that later that morning the defendant telephoned her and told her that Laura had pulled a stereo down on herself and was at St. Anthony's Hospital in a coma. She testified that Laura was subsequently

transferred to Cook County Hospital, where she died that afternoon.

Officer John Grantz and Detective James Clemmons of the Chicago police department testified that they were called to investigate a possible child abuse case at St. Anthony's Hospital on August 27, 1985. Both officers testified that, when questioned in the hospital emergency room, the defendant stated that he was alone with the victim and believed that her injuries were caused by a stereo falling on her. Detective Clemmons testified that he spoke with a physician at the hospital concerning the victim's injuries, and was told the laceration which extended from Laura's vagina to her anus was not consistent with the defendant's story about the stereo equipment. Detective Clemmons testified that he observed bruises on the victim's face, head, back and stomach, and saw blood running from her vagina when the doctor opened her diaper. After learning that the injuries were inconsistent with the defendant's explanation, Detective Clemmons took the defendant to the police station for questioning.

Detective Ginko testified at the trial that he and Detective Lahm questioned the defendant at 3 p.m. for 10 minutes. Ginko testified that, after waiving his *Miranda* rights, the defendant stated that he was alone with the victim in the apartment when he heard a noise that sounded like something falling. The defendant said that he walked from the bathroom into the bedroom and discovered Laura lying on her back, with a bruise on her face, and stereo components on her leg and above her head. The defendant also told the officers that his mother, Elizabeth Terrell, came home shortly thereafter and took the baby to the hospital.

Assistant State's Attorney James Sullivan testified that he interviewed the defendant at 6:45 p.m. for 25 minutes, in the presence of Detectives McManamon and

Nuccio. Sullivan said the defendant gave an oral statement during this interview. A court reporter was then summoned and the defendant gave a statement in the court reporter's presence. After the statement was reduced to writing, the defendant read and signed the statement. The trial court admitted this transcribed statement into evidence.

Prior to giving the statement, the defendant was advised of his *Miranda* rights, said that he understood those rights and agreed to discuss the victim's injuries and death. The defendant stated that he was left alone with Laura Hampton at approximately 10 a.m. on August 27, 1985, when his mother went to the currency exchange to cash a check. He stated that he carried Laura into the bedroom and laid her on the bed next to him. When the baby woke up and began to cry, the defendant struck her on the back with his open hand. Laura continued to cry, so the defendant changed her diaper. Laura continued to cry after her diaper was changed, so the defendant struck her again with an open hand on the side of the face. The defendant then picked her up and laid her on her back across a pillow. When she continued to cry, he hit her four or five times in the stomach with a closed fist. The defendant then noticed that Laura had had a bowel movement, so he cleaned her and put on a new diaper, but did not fasten it. The defendant stated that he inserted a Q-tip and then his finger into the baby's vagina and started "handling her." The defendant admitted that it was difficult to put his finger in "there." The defendant stated that he inserted his finger a couple of inches, "up to the bone" and stated that he was "looking for a pain response." The defendant stated that the baby "hollered for a few minutes, then stopped hollering." Defendant said that he continued this for about "a minute or two" until he heard his mother knock at the door. When his mother entered the apart-

ment, the defendant told her that the baby had accidentally pulled the stereo onto herself. He told the assistant State's Attorney that he had put the stereo on the floor when he first saw the bruises on the baby's face, before he put his finger in the baby's vagina. In concluding the statement, the defendant stated that he had been treated well by the police and the assistant State's Attorney and that he had not been threatened.

Dr. Robert Stein, the medical examiner of Cook County and a forensic pathologist, described the nature and extent of the victim's injuries at trial. He testified that his postmortem examination revealed blood in the victim's peritoneal and pleural cavities, collapsed lungs, contusions of the heart, lacerations of the liver and a tearing of the mesentery. His examination also revealed blood on the kidneys and pelvis as well as lacerations of the vagina and rectum. He testified that the victim's injuries were recent and produced before death. He concluded that the victim's death had been a homicide. He also testified that the lacerations to the victim's genital area were consistent with a finger or Q-tip being inserted into the vagina.

At the trial, the defendant testified that he was left alone with Laura at approximately 9:30 a.m. on August 27, 1985, when his mother went to the currency exchange. He stated that he took the baby to the hospital at approximately 11 a.m. and told the police that it appeared as though a stereo had fallen on the victim. On cross-examination, the defendant denied that he watched Laura while his mother went to the currency exchange. He testified that he "stepped out" for approximately 40 minutes while his mother was gone and left Laura alone in the apartment. He stated that he spoke to "associates" while he was gone, but could not remember any of their names. The defendant stated that when he returned to the apartment, it appeared as though a stereo

had fallen on Laura. Later, he said that he heard the stereo fall after returning to the apartment. Although the defendant on cross-examination denied portions of his written statement, he conceded that the words in the statement were his own and that he was not told what to say or physically beaten by police. He claimed, however, that he gave a statement to the assistant State's Attorney because a police officer had confronted him and asked him whether he knew what happened to people who did not cooperate with police. On redirect examination the defendant testified that the statements he made to police at the hospital were true.

After hearing the evidence and closing arguments, the trial court found the defendant guilty of murder and aggravated criminal sexual assault. The State then requested a death penalty hearing, and the defendant waived his right to be sentenced by a jury. Based on evidence introduced at the eligibility phase of the proceedings, the trial court found the defendant to be 18 years old at the time of the crimes and that two of the aggravating factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) were present: (1) the defendant had been convicted of murdering a victim under 12 years of age and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)), and (2) the defendant murdered the victim in the course of another felony, that of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)). Based on these findings, the court found the defendant eligible for the death penalty and then heard evidence in aggravation and mitigation.

In aggravation, the State introduced the testimony of Dr. Demetra Soter, who treated the victim at Cook County Hospital on August 27, 1985. Dr. Soter described the lacerations to Laura's vagina, rectum, liver and me-

sentery. She testified that there had been severe and repeated trauma to the victim's vagina and rectum and that a tremendous force was necessary to cause the tears that she observed of the victim's liver, vagina and rectum. She testified that she doubted whether she would have been physically able to exert the force to cause the injuries she observed.

Markeeter Hampton testified at the sentencing hearing regarding the emotional pain she and her family suffered because of Laura's death, and her victim impact statement was admitted into evidence without objection by defense counsel. The State also introduced certified copies of two separate robbery convictions of defendant and the testimony of two police officers who investigated those robberies. Finally, Detective McManamon testified that he determined, after consulting hospital personnel, that the defendant's mother had brought Laura to the hospital.

In mitigation, the defendant's father, stepmother and cousin testified that the defendant's problems were attributable to his mother's bad influence. The defendant then told the court that he did not murder Laura Hampton, that he loved children, and asked the court for mercy. The trial court concluded that there were no mitigating factors sufficient to preclude the imposition of death and sentenced the defendant to death. The court also sentenced the defendant to an extended term of 60 years' imprisonment for aggravated criminal sexual assault, to run consecutively with the defendant's death sentence. The defendant's death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

I

The defendant raises a number of issues relating to his conviction in this appeal. He first argues that his

conviction should be reversed and a new trial ordered because the trial court erred in failing to suppress inculpatory statements he made at the police station following his arrest. Prior to trial, the defendant filed a written motion to suppress his confession. Following an extended hearing, the trial judge denied the motion, finding that the defendant had given the statements voluntarily.

At the hearing on the motion to suppress, the defendant testified that on August 27, 1985, at approximately 11 a.m., he was at the hospital where Laura Hampton was receiving treatment for her injuries. He testified that an officer asked him to go to the police station for questioning. The officer then escorted him to the station and placed him in an interview room. He testified that 45 minutes later, the officer returned to the interview room and questioned him for five minutes. The officer then left, but returned a short time later with another officer. He testified that the officers questioned him for 30 minutes and then left.

The defendant testified that two different officers interviewed him at approximately 4:30 p.m. He claimed that these officers asked him some questions and then left. The defendant testified that, shortly thereafter, one of the officers returned and advised him of his *Miranda* rights. The defendant testified that the officer escorted him to and from the bathroom and then left again for an hour and a half. He testified that during this time period several officers came into the interview room and asked him if he wanted water, cigarettes or to use the bathroom. The defendant testified that the two officers who had questioned him at 4:30 p.m. returned to the interview room at approximately 7:30 p.m. He testified that one of the officers, Detective McManamon, began making accusations and grabbed him by the collar, pushed him in the chest, and demanded more information.

On cross-examination, the defendant testified that he had smoked a marijuana cigarette laced with PCP at 1 a.m. on August 27, 1985, and another one hour before he was taken into custody and that he was under the influence of drugs at the time he confessed. He also testified that he was not told that his family was present at the police station, and that when he asked the assistant State's Attorney "where's my lawyer," he did not receive an answer. On redirect examination, the defendant testified that he repeatedly asked the police and assistant State's Attorney if he could use the telephone to call his family, but his requests were denied. The defendant admitted that he told the assistant State's Attorney that he had been treated well by the police, but stated that he was lying at that time.

Witnesses for the State testified that the defendant was questioned on three separate occasions after he arrived at the station. Detective Lahm testified that he and his partner, Detective Ginko, interviewed the defendant at 3 p.m. Lahm testified that he advised the defendant of his *Miranda* rights. The defendant then waived those rights and agreed to talk to the detectives. Lahm testified that he and Ginko then questioned the defendant for approximately 10 minutes. Lahm testified that he did not threaten, harass or physically harm the defendant. Although Lahm testified that he could not tell whether the defendant was under the influence of marijuana laced with PCP, he stated that the defendant appeared normal during their conversation.

Detective McManamon testified that he and his partner, Detective Nuccio, questioned the defendant at 5 p.m. McManamon testified that he read the defendant his *Miranda* rights before questioning him. He testified that the defendant stated that he understood those rights, and wished to waive them. The detectives then questioned the defendant for approximately 40 minutes.

McManamon testified that the defendant was not hand-cuffed at the time he was questioned and that the defendant appeared sober, stable and normal during this conversation. McManamon also testified that he did not threaten, harass, or abuse the defendant. He also stated that he did not grab the defendant by the collar or punch him in the chest. McManamon testified that after he and his partner interviewed the defendant, the Felony Review Unit of the State's Attorney's office was contacted.

Assistant State's Attorney James Sullivan testified at the hearing that he spoke with the defendant at 6:45 p.m., in the presence of Detectives McManamon and Nuccio. Sullivan testified that he advised the defendant of his *Miranda* rights, and explained that he was an attorney who worked with the police and was not the defendant's attorney. After the defendant indicated that he understood his rights and wished to waive them, he gave an oral statement to Sullivan. Sullivan testified that the defendant appeared sober and coherent, was not handcuffed, and had no cuts or bruises. Sullivan denied that he threatened or harassed the defendant. Sullivan testified that, before he left the interview room, he asked the defendant if he had been given anything to eat or drink and the defendant replied that he had been given coffee and cigarettes. At approximately 8:15 p.m., Sullivan reentered the interview room, informed the defendant that a court reporter was on her way, and asked him if there was anything he needed. Sullivan testified that the defendant replied that he did not need anything to eat or drink and that he had been well treated.

At 8:50 p.m., a court reporter transcribed the defendant's statement in the presence of Sullivan, Nuccio and McManamon. McManamon testified that, while the statement was being typed, he was informed that members of

the defendant's family were at the police station and wanted to bring the defendant something to eat. McManamon told the family that they could bring the defendant food. McManamon testified that prior to that time, the defendant had not asked for anything to eat, but had been given something to drink and the opportunity to use the bathroom. After the statement was reduced to writing, the defendant read, signed and initialed each page of the statement. The defendant's family brought him food shortly after he signed the statement.

Several members of the defendant's family testified at the suppression hearing that they went to the police station on the evening of August 27, but were told by police officers that they could not see the defendant. One witness, Irene Lewis, testified that, when one of the police officers opened the door of the interview room where the defendant was being held, she put her foot in the opening and told the defendant, "God love you, we will pray for you, keep your chin up." The defendant's aunt testified that she briefly saw the defendant walking to the bathroom and that he looked tired but not injured. The defendant's stepmother testified that she told a police officer that the defendant should not be questioned without an attorney, but was told that he did not need an attorney. The defendant's stepmother also testified that she was allowed to bring the defendant food, and that the defendant's mother was allowed to see the defendant after he signed the written statement.

At the conclusion of the suppression hearing, the trial court found that the defendant had knowingly and voluntarily waived his *Miranda* rights. The court concluded that the defendant had not asked for a lawyer, and that the defendant's family members could not invoke his personal right to an attorney. The court also stated it had considered the defendant's allegations that he had

been threatened, but concluded, after considering the totality of the circumstances, that the defendant had freely and voluntarily given the inculpatory statement to the police. Accordingly, the trial court denied the defendant's motion to suppress.

The defendant raises two arguments in this appeal to support his contention that his confession should have been suppressed.

A

First, he claims that his statements were involuntary and admitted into evidence in violation of his rights under the fourteenth amendment of the United States Constitution. He maintains that his statements were involuntary because the police held him incommunicado at the police station for approximately nine hours, denied his requests to use the telephone, and refused to allow his family to see him. (*Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336.) Second, the defendant claims that his statement should have been suppressed because the police and the assistant State's Attorney violated his statutory rights by repeatedly denying his requests to use the telephone in violation of section 103—3 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 103—3). That section provides that arrested persons shall have a right to communicate with an attorney or family member by making telephone calls, or in any reasonable manner, within a reasonable time after arrival at the first place of custody.

The State responds that the defendant has waived both the constitutional issue and the statutory issue by failing to raise them in his post-trial motion. This court has recently affirmed that both an objection at trial and a specific objection in a written post-trial motion are necessary to preserve an issue for review. (*People v. Enoch*

(1988), 122 Ill. 2d 176, 187; *People v. Johnson* (1987), 119 Ill. 2d 119.) Here, the defendant's post-trial motion states only that the "defendant was denied due process of law." The motion does not allege that the trial court erred in failing to suppress the defendant's confession, nor does it specify that his confession was involuntary or obtained in violation of his statutory rights. The post-trial motion does include a statement that it is "expressly understood that defense counsel has not yet been furnished with an official transcript of the trial and makes this motion on behalf of his client, without prejudice to or waiving the later discovery of error in the trial record." This apparent attempt to preserve any and all errors on appeal is ineffective, especially when, as here, defense counsel would have known of the claimed errors without the benefit of a transcript. (*People v. Camp* (1984), 128 Ill. App. 3d 223, 233.) The defense counsel certainly knew that the trial court denied the defendant's motion to suppress, and could have raised the statutory issue and cited at least some of the circumstances that allegedly rendered the confession involuntary in the post-trial motion without need to refer to a transcript of testimony.

The plain error rule of course permits a court on direct appeal to take notice of plain errors and defects affecting substantial rights which were not brought to the attention of the trial court. (107 Ill. 2d R. 615(a); *People v. Gacho* (1988), 122 Ill. 2d 221, 239.) We will not review the defendant's statutory claim under the plain error rule, because the alleged error is not one that could have deprived the accused of a fair trial. The defendant's allegation that his confession was involuntary and obtained in violation of the due process clause, on the other hand, is a matter cognizable on appeal notwithstanding the lack of any contemporaneous objection.

In determining whether a statement has been voluntarily given, this court looks at the totality of the circumstances. (*People v. Martin* (1984), 102 Ill. 2d 412.) Factors to consider when making a determination of voluntariness include the age, education and intelligence of the accused, the length of the detention and the duration of questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment. (*People v. Martin* (1984), 102 Ill. 2d 412.) The test for voluntariness is not to determine whether the accused wanted to confess or would have confessed in the absence of interrogation. (See *Stein v. New York* (1953), 346 U.S. 156, 182, 97 L. Ed. 1522, 1541, 73 S. Ct. 1077, 1091.) Criminals typically do not confess to the police purely of their own accord, without any questioning. Rather, the issue typically is whether the defendant's will was overborne at the time he confessed. See *People v. Kincaid* (1981), 87 Ill. 2d 107, 119.

As we stated, the trial court concluded, after hearing the evidence presented at the suppression hearing, that the defendant's statements were not involuntary and denied the defendant's motion to suppress. A trial court's determination that a confession is voluntary will not be reversed unless it is contrary to the manifest weight of the evidence. (*People v. King* (1986), 109 Ill. 2d 514.) We conclude that the trial court's conclusion that the defendant's confession was voluntary was not against the weight of the evidence.

The evidence presented at the suppression hearing showed that the defendant was 18 years old, literate, and at the time had completed three years of high school. He had had previous experience with the criminal justice system and, thus, was aware of the consequences of confessing. Although the defendant claimed that he was under the influence of drugs at the time he con-

fessed, all of the State's witnesses testified that the defendant appeared normal and sober during interrogation.

The defendant was repeatedly advised of his *Miranda* rights, stated that he understood those rights, and proceeded to give an oral statement without requesting an attorney or indicating that he wished to remain silent. The record supports the conclusion that he understood his constitutional rights and the questions he was asked, as well as his own written statement.

Although the defendant was in custody for eight hours before he confessed, the periods of questioning to which he was subjected were not prolonged and were interspersed with significant rest periods. In view of the nature of the crime and the investigation the police were conducting, the period of detention was not unreasonable. (*People v. Taylor* (1974), 58 Ill. 2d 69.) The situation here is distinguishable from ones of lengthy interrogations during incommunicado detention that have been held to result in involuntary confessions. See, *e.g., Davis v. North Carolina* (1966), 384 U.S. 737, 16 L. Ed. 2d 895, 86 S. Ct. 1761 (defendant held for 16 days of incommunicado detention in closed cell, with no windows, limited food, and coercive tactics); *Culombe v. Connecticut* (1961), 367 U.S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860 (defendant held for five days of repeated questioning during which police employed coercive tactics).

The defendant testified that he made the inculpatory statements because a police officer threatened and coerced him. There was no evidence to support this claim. The officer whom the defendant implicated specifically denied that he harassed, threatened or physically abused the defendant. The defendant also claimed that he made the inculpatory statements because he was not allowed to see family members. The defendant admitted at the suppression hearing, however, that he did not ask to see

his family, and the trial court specifically found that the defendant made inculpatory statements to the police before his family members came to the police station.

The defendant argues that witnesses for the State never rebutted his testimony that the police and assistant State's Attorney refused to allow him to use the telephone. As the State points out, however, the defendant's motion to suppress did not claim that the defendant asked to use the telephone or that his requests were denied. In fact, the defendant did not raise this question until the end of the suppression hearing, after all of the witnesses for the State had testified.

The facts in *Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336, upon which the defendant relies, are distinguishable. Haynes, like the defendant in this case, claimed that the police told him that he could not use the telephone. Haynes' claim, however, was corroborated by other evidence. For example, the police officers who questioned Haynes admitted at trial that Haynes asked to use the telephone while he was being interrogated. In addition, the transcribed confession which the State introduced at trial disclosed that the defendant repeatedly asked if he could call his wife, and that the police told him that he could call his wife only when he gave a statement and cooperated with them. Here, in contrast, there was no evidence to support the defendant's claim that he was denied access to the telephone.

Even if we assume that the trial judge believed the defendant's uncorroborated testimony that the police and assistant State's Attorney ignored his requests to use the telephone, that would not invalidate the confession as a matter of law. The evidence in this case, unlike that in *Haynes*, does not support the inference that the defendant's will was overborne. In *Haynes*, the evidence established that the defendant was held incommunicado

for 16 hours before he confessed and that the police continued the incommunicado detention for another five days while persisting in efforts to obtain his signature on another confession. Here, in contrast, the defendant was in custody for, at most, eight hours when he made inculpatory statements. The defendant, unlike Haynes, was advised of his right to remain silent, warned that his answers might be used against him, and told of his right to consult an attorney. On the record before us, we find no indication that the defendant's will was overborne and that any inculpatory statements were involuntary. The totality of the circumstances shows that the defendant's statements were voluntary. See *People v. Martin* (1984), 102 Ill. 2d 412; *People v. Caballero* (1984), 102 Ill. 2d 23; *People v. Davis* (1983), 95 Ill. 2d 1.

## B

The defendant next argues that his inculpatory statements to the police should have been suppressed because the State failed to produce or explain the absence of three material witnesses at the hearing on his motion to suppress. The defendant claims that the following three material witnesses were absent: Officer Clemmons, who interviewed him at the hospital, Detective Ginko, who interviewed him at the police station, and the court reporter who transcribed his oral statement at the police station. The defendant maintains that these persons were material witnesses on the issue of whether he was under the influence of marijuana and PCP at the time he was questioned by the police. The defendant argues that the State's failure to produce these witnesses at the suppression hearing constitutes reversible error. The State responds that the defendant has waived this issue by failing to object to the State's failure to call the witnesses in the trial court and by failing to raise the issue in his motion for a new trial.

The material-witness rule calls upon the State to produce or explain the absence of all material witnesses connected with the taking of a confession whenever the voluntary nature of a confession is brought into question by a motion to suppress. (*People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76; *People v. Rogers* (1922), 303 Ill. 578.) Section 114—11 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 114—11) provides, however, that any objection to the failure to call a material witness must be made at trial. The defendant's trial counsel did not object to the State's failure to call the witnesses at the suppression hearing and did not raise the issue in his motion for a new trial. Had defense counsel timely objected, the trial court could have ruled on it, and in any event the State would have had an opportunity to produce any other witnesses that the trial court deemed material. As stated above, failure to object to a claimed error in the trial court and in a post-trial motion will result in waiver of the issue because of procedural default. *People v. Enoch* (1988), 122 Ill. 2d 176; *In re Lamb* (1975), 61 Ill. 2d 383.

The defendant acknowledges his procedural default, but argues that this court should regard the State's failure to produce a material witness at a suppression hearing as "plain error." We have reviewed the record and judge that the State's failure to call certain witnesses at the suppression hearing was not plain error. The evidence at the suppression hearing relating to the defendant's asserted intoxication was not closely balanced. Witnesses for the State testified that the defendant appeared sober and coherent at all periods of interrogation. That the State did not produce every witness who had any contact with the defendant was not a substantial defect that could have deprived the defendant of a fair trial.

## II

The defendant next contends that his murder conviction must be overturned because the evidence failed to show beyond a reasonable doubt that he acted with the mental state necessary to sustain a murder conviction under section 9—1(a)(1) or 9—1(a)(2) of the Criminal Code. Citing *People v. Mitchell* (1984), 105 Ill. 2d 1, the defendant argues that the care and concern he showed for the victim after he struck her, and the fact that he did not complete the crime, despite his opportunity to do so, demonstrate that he lacked the specific intent to kill required under section 9—1(a)(1). He also contends that the State failed to prove beyond a reasonable doubt that he knew at the time of the beating that his acts created a strong probability of death or great bodily harm, as required by section 9—1(a)(2). He argues that the evidence, at most, demonstrated that his blows constituted a reckless attempt to quiet a crying child and, thus, supports only a conviction for involuntary manslaughter, not murder.

The defendant was charged under all three sections of the murder statute (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)). Accordingly, the defendant could be found guilty of murder if the evidence established that (1) he intended to kill or do great bodily harm to the victim or knew that his actions would cause the victim's death, or (2) he knew that his acts created a strong probability of death or great bodily harm, or (3) he was attempting or committing a forcible felony (other than involuntary manslaughter) from which death resulted. Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).

### A & B

The character of the defendant's acts and the circumstances surrounding the acts were such that the trial

court could reasonably infer that the defendant had the mental state required to sustain a murder conviction under any or all three sections of the murder statute. Intent to kill or cause great bodily harm is not commonly proved by direct evidence. Intent may be inferred from the character of the defendant's acts and the circumstances surrounding the commission of the offense. (*People v. Garcia* (1983), 97 Ill. 2d 58, 85.) The defendant is presumed to intend the natural and probable consequences of his acts, and evidence that the defendant committed a voluntary and willful act which has the natural tendency to cause death or great bodily harm is sufficient to prove the intent required for the offense of murder. (*People v. Foster* (1987), 119 Ill. 2d 69, 88.) For example, when a defendant intentionally uses a deadly weapon upon the victim, it may properly be inferred that he intended to cause the death of the victim. *People v. Salazar* (1988), 126 Ill. 2d 424; see also 2 W. LaFave & A. Scott, Substantive Criminal Law §7.2, at 193 (1986).

Although what in the ordinary sense is regarded as a deadly weapon was not used here, this court has held that death may be a natural consequence of a blow from a bare fist where there is great disparity in size and strength between the defendant and the victim (*People v. Brackett* (1987), 117 Ill. 2d 170, 180; *People v. Ward* (1984), 101 Ill. 2d 443, 452). In *Brackett*, it was held that a 21-year-old, 170-pound, adult male who beat an 85-year-old woman with sufficient force to break bones could not claim that he was unaware that blows from his bare fists created a strong probability of death or great bodily harm. (*Brackett*, 117 Ill. 2d at 180.) Similarly in *Ward*, this court upheld the murder conviction of an adult male defendant who beat a four-year-old child to death with his fists and a mop handle. The court held that the defendant was not entitled to an involuntary manslaughter instruction where the evidence showed

that the defendant was not simply acting recklessly. *Ward*, 101 Ill. 2d at 451-53.

Here too, the nature of the infant's injuries and the deliberate force needed to cause them negate any suggestion that the defendant's acts were only reckless and not intentional. The evidence established that the defendant struck the 15-month-old victim on the face and back with his open hand because, he said, she would not stop crying. When he saw that he injured the baby, he placed the stereo unit on the floor so that it would look as if the stereo caused her injuries. When the baby continued to cry, the defendant repeatedly beat her with a closed fist in the stomach. After severely beating the infant, the defendant brutally sexually assaulted her, by inserting a Q-tip and his finger into her vagina. The defendant stated that he inserted his finger almost to the bone for a minute or two, "looking for a pain response." He admitted that he removed his finger from the infant's vagina only when he heard his mother at the door.

The medical testimony established that the victim sustained injuries on almost every part of her body, including the head, face, back, waist, stomach, rectum and vagina. The defendant beat the victim so severely that both of her lungs collapsed and she began hemorrhaging in the head, stomach, kidneys and pleural cavities. The defendant also sexually assaulted the victim with sufficient force to tear her liver, rectum and vagina. Given the extent of the victim's injuries and the force that was needed to cause them, it is an absurdity for the defendant to argue that he did not know that his actions would cause great bodily harm to the victim or that they created a strong probability of death or great bodily harm to the infant. The evidence clearly supported a conviction for murder under either section 9—1(a)(1) or (a)(2) of the Criminal Code.

The *Mitchell* decision, upon which the defendant relies, is distinguishable. In *Mitchell*, this court reversed the attempted murder conviction of a mother who severely beat her 16-month-old infant, because the evidence failed to prove that the defendant had the specific intent to kill. This court held that the fact that the defendant had ample opportunity to kill her child, but instead took the child to the hospital for emergency treatment, was inconsistent with a specific intent to kill. (*Mitchell*, 105 Ill. 2d at 6-10.) In this case, on the other hand, the defendant admitted that he stopped sexually assaulting the child only because his mother knocked at the door and that his mother took the child to the hospital for emergency treatment. In addition, the defendant here, unlike Mitchell, had mortally injured his victim before he was interrupted.

## C

In addition, the defendant totally ignores that he was charged under section 9—1(a)(3) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(3)). Under that section, a defendant may be convicted of murder if he commits a forcible felony from which death results. The State proved at trial that the defendant was guilty of aggravated criminal sexual assault by showing that he intentionally inserted his finger and a Q-tip into the baby's vagina, causing severe bleeding and extensive lacerations. (See Ill. Rev. Stat. 1985, ch. 38, par. 12—14.) The evidence proved that the defendant committed a forcible felony against the infant, which resulted in her death and thereby established that the defendant was guilty of felony murder under section 9—1(a)(3).

## III

The defendant next argues that his conviction for aggravated criminal sexual assault must be overturned be-

cause the criminal sexual assault statute, section 12—13 of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—13), and the aggravated criminal sexual assault statute, section 12—14 of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 12—14), violate the due process clauses of the State and Federal Constitutions. The defendant raises three arguments in support of this assertion.

## A

He first argues that the aggravated criminal sexual assault statute (Ill. Rev. Stat. 1985, ch. 38, par. 12—14) is unconstitutional because it requires a less culpable mental state than is required for the lesser offense of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16). Aggravated criminal sexual assault is defined in section 12—14 of the Criminal Code, which specifies that an accused commits aggravated criminal sexual assault if he or she commits an act of "sexual penetration" under certain defined circumstances (Ill. Rev. Stat. 1985, ch. 38, par. 12—14). "Sexual penetration" is defined as:

> "[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(f).)

The lesser offense of aggravated criminal sexual abuse occurs when an offender commits an act of "sexual conduct" under defined circumstances. (Ill. Rev. Stat. 1985, ch. 38, par. 12—16.) "Sexual conduct" is defined as:

> "[A]ny intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under

13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused." (Ill. Rev. Stat. 1985, ch. 38, par. 12—12(e).)

The defendant argues that section 12—14 is unconstitutional because it punishes "sexual penetration," which does not require a specific mental state, more severely than "sexual conduct," which requires that the touching or fondling be either "intentional or knowing" and "for the purpose of sexual gratification or arousal of the victim or the accused."

As authority, the defendant cites *People v. Wick* (1985), 107 Ill. 2d 62, where this court held that the aggravated arson statute violated due process because the statute did not require an unlawful purpose on the part of a person setting a fire, and therefore punished innocent as well as culpable conduct. The *Wick* court noted, by way of contrast, that the simple-arson statute required an unlawful purpose on the part of the person setting the fire. The court concluded that it was unreasonable for the legislature to punish aggravated arson, which required no mental state, more severely than simple arson, which required a culpable mental state. *People v. Wick* (1985), 107 Ill. 2d 62, 63-68.

The defendant argues that the aggravated criminal sexual assault statute, like the statute struck down in *Wick*, does not require an unlawful purpose on the part of the person who commits an act of sexual penetration and, therefore, punishes innocent as well as culpable conduct. The defendant maintains that it is unreasonable and arbitrary for the legislature to punish offenses based upon an act of sexual penetration, which requires no mental state, more severely than offenses based upon an act of sexual conduct, which requires a mental state. The defendant contends that the aggravated criminal sexual assault statute therefore violates due process.

The State argues that the defendant has waived this issue by failing earlier to challenge the constitutional validity of section 12—14. The defendant responds that the issue is reviewable under the plain error rule. Because we find no merit in the defendant's contentions, we need not consider whether the defendant is barred from raising them in this appeal.

In *People v. Burmeister* (1986), 147 Ill. App. 3d 218, the court considered and convincingly rejected a similar challenge to the constitutionality of the aggravated criminal sexual assault statute. Although the definition of "sexual penetration," unlike the definition of "sexual conduct," does not expressly require a mental state, the legislature clearly did not intend the aggravated criminal sexual assault statute to define a strict liability or public welfare offense. (Ill. Rev. Stat. 1985, ch. 38, par. 4—9.) Accordingly, a mental state of either intent or knowledge implicitly is required for sexual penetration to occur. (Ill. Rev. Stat. 1985, ch. 38, pars. 4—3, 4—4, 4—5, 4—6, 4—9.) So construed, the aggravated criminal sexual assault statute does not punish innocent conduct or set up an unconstitutional anomaly between the greater offense of aggravated criminal sexual assault and the lesser offense of aggravated criminal sexual abuse. (*People v. Burmeister* (1986), 147 Ill. App. 3d 218, 224.) Rather, both aggravated criminal sexual assault and the lesser offense of aggravated criminal sexual abuse require an intentional or knowing act by the accused.

The legislature may rationally decide to punish "sexual penetration," required for the sexual assault offenses, more severely than "sexual conduct," required for the sexual abuse offenses. As stated, "sexual penetration" involves a physical contact between the sex organ of one person and the sex organ, mouth or anus of another, or an actual intrusion into the sexual organ or anus of the victim. "Sexual conduct," on the other hand,

requires only a touching or fondling of the sex organs, anus or breast of the victim and may be done with the hands or any part of the body of the accused. (*People v. Burmeister* (1986), 147 Ill. App. 3d 218, 223.) The legislature may rationally conclude that an improper act of "sexual penetration" is a more serious act and a greater insult to the personal dignity of the victim than the touching or fondling required for "sexual conduct." (*People v. Burmeister* (1987), 147 Ill. App. 3d 218, 223.) Accordingly, we hold that the aggravated criminal sexual assault statute does not on the ground claimed violate due process. *People v. Bartay* (1986), 150 Ill. App. 3d 130.

The defendant argues that his conviction for aggravated criminal sexual assault must be reversed even if this court judges that a mental state requirement is implicit in the statute, because the evidence failed to establish that his contact with the victim was for the purpose of sexual gratification or arousal. The defendant's argument is based upon the erroneous assumption that the implicit mental state is "intentional or knowing for the purpose of sexual gratification or arousal of the victim or accused." When a statute fails to prescribe a mental state applicable to an element of an offense, however, a mental state of intent, knowledge or recklessness is implied. (Ill. Rev. Stat. 1985, ch. 38, pars. 4—3, 4—4, 4—5, 4—6.) This court will not presume that the legislature intended to limit the definition of "sexual penetration" only to those acts done for the purpose of sexual gratification or arousal of the accused or the victim.

The legislature may have added the sexual gratification language to the definition of "sexual conduct" because it is possible for the touching which is part of that offense to occur accidentally or unintentionally. (*People v. Bartay* (1986), 150 Ill. App. 3d 130; *People v. Burmeister* (1986), 147 Ill. App. 3d 218, 224.) The legislature may

have likewise determined that it was not necessary to include the sexual gratification language in the statute defining "sexual penetration" because the sexual activity proscribed in that statute is, by nature, intentional. The absence of the language may also evidence the legislature's intent to punish sexual intrusions, whether motivated by force or by sexual gratification. The legislature evidenced its intent to eliminate acts of "sexual penetration" with innocent intentions from the purview of the aggravated criminal sexual assault statute when it enacted section 12—18 (Ill. Rev. Stat. 1985, ch. 38, par. 12—18). That section exempts from criminal liability medical examinations and procedures conducted by parents, caretakers, physicians, or other medical personnel for purposes and in a manner consistent with reasonable medical standards. Ill. Rev. Stat. 1985, ch. 38, par. 12—18.

## B

The defendant next argues that the aggravated criminal sexual assault and the criminal sexual assault statutes, sections 12—13 and 12—14 of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13, 12—14), are constitutionally overbroad. He argues that both statutes are deficient because the legislature failed to limit the definition of "sexual penetration" to those acts done for the purpose of sexual gratification or arousal of the victim or the accused. He maintains that sections 12—13 and 12—14, under which sexual penetration is required, could therefore be construed to punish innocent behavior such as bathing the vaginal area of an unwilling child.

A similar attack upon section 12—13, the criminal sexual assault statute, was made in *People v. Haywood* (1987), 118 Ill. 2d 263. The defendant there, as here, contended that the sexual assault statute was constitutionally overbroad because it could be applied in a different context to punish constitutionally protected activity.

Although the evidence in *Haywood* clearly established that the defendant had engaged in nonconsensual sexual activity with the victim, the defendant set forth several hypothetical situations to demonstrate that the term "force" was so broadly defined in the criminal sexual assault statute that a participant in consensual sexual activity could be prosecuted under the statute. *People v. Haywood* (1987), 118 Ill. 2d 263, 275.

The *Haywood* court reaffirmed the general principle that a person to whom a statute may be constitutionally applied does not have standing to challenge that statute as overbroad on the ground that it might be applied unconstitutionally to others in a different context. (*People v. Haywood* (1987), 118 Ill. 2d 263, 275.) A person lacks standing to challenge the constitutionality of a statute unless he is directly affected by the alleged unconstitutionality or unless he claims that the statute may inhibit the exercise of rights protected under the first amendment. (*People v. Haywood* (1987), 118 Ill. 2d 263, 275; *People v. Caffrey* (1983), 97 Ill. 2d 526, 529.) In this case, like in *Haywood*, the aggravated criminal sexual assault and the criminal sexual assault statutes which the defendant challenges as overbroad may be constitutionally applied to the defendant. The defendant does not have standing to challenge the constitutionality of those statutes on the ground that they may be applied unconstitutionally to others in a different situation.

## C

The defendant next argues that subsection (b)(1) of the aggravated criminal sexual assault statute violates the due process clauses of the Illinois and United States Constitutions. That section provides:

"(b) The accused commits aggravated criminal sexual assault if:

(1) the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed." Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1).

The defendant argues that by entitling section 12—14(b)(1) aggravated criminal sexual assault, the legislature evidenced its intent to define an aggravated form of criminal sexual assault. He notes, however, that criminal sexual assault is not a lesser included offense of aggravated criminal sexual assault as that offense is defined in section 12—14(b)(1). He submits that, because criminal sexual assault is not an underlying offense for aggravated criminal sexual assault as defined in section 12—14(b)(1), the statute is not reasonably related to the public interest which the legislature intended to protect, and violates due process. The defendant cites *People v. Johnson* (1986), 114 Ill. 2d 69, as authority for his contention.

The State concedes that criminal sexual assault is not a lesser included offense of aggravated criminal sexual assault, as that offense is defined in section 12—14(b)(1). It argues, however, that section 12—14(b)(1) does not need a lesser underlying offense to be constitutionally valid. The State argues that the defendant's reliance upon the *Johnson* decision is misplaced because the statute at issue in *Johnson*, unlike section 12—14(b)(1), was based upon a lesser included offense which required a more culpable mental state.

In *Johnson*, this court invalidated a section of the aggravated arson statute which made it a Class X felony to knowingly damage by fire a building known to have a person or persons inside (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1(a)(1)). This court had previously held another subsection of the aggravated arson statute unconstitutional because it did not require an unlawful purpose on the part of the person setting the fire, and therefore punished innocent as well as culpable conduct. (*People v.*

*Wick* (1985), 107 Ill. 2d 62.) In *Johnson*, the State attempted to distinguish the subsection of the aggravated arson statute at issue from that held invalid in *Wick* by arguing that burning a building known to have a person inside could not be innocent conduct. This court pointed out, however, that the legislature enacted the aggravated arson statute to define the factors which would enhance the underlying offense of arson to the more serious crime of aggravated arson. The statute was flawed because the legislature neglected to state that the offender must set the fire with an unlawful purpose. This court concluded that the statute violated due process because the underlying conduct, which the aggravating factor was meant to enhance, was not necessarily criminal in nature. *People v. Johnson* (1986), 114 Ill. 2d 69, 72.

The *Johnson* case did not establish any principle that every aggravated offense must have a lesser included offense to be constitutionally valid. Rather, that court held that it was irrational for the legislature to punish a person who set a fire without a culpable mental state more severely than a person who set a fire with a culpable mental state. (*People v. Johnson* (1986), 114 Ill. 2d 69, 72.) The statute at issue in this case is distinguishable in two respects from the aggravated arson statute struck down in *Johnson*. First, both the aggravated criminal sexual assault and the criminal sexual assault statutes punish only those offenders who commit an act of sexual penetration with a culpable mental state. In *Johnson*, on the other hand, the arson statute required the offender to set a fire with a culpable mental state, but the aggravated arson statute did not.

Second, in *Johnson* this court concluded that the legislature enacted the aggravated arson statute solely to define those factors which would enhance the lesser offense of arson into the greater offense of aggravated arson. (*People v. Johnson* (1986), 114 Ill. 2d 69, 72.) The

defendant argues that here, like in *Johnson*, the legislature evidenced its intent to define an enhanced form of criminal sexual assault when it entitled the offense defined in section 12—14(b)(1) aggravated criminal sexual assault. Section 12—14, however, contains two separate and distinct provisions. The first, section 12—14(a), like the aggravated arson statute, defines the circumstances which will enhance the offense of criminal sexual assault, a Class 1 felony, to the offense of aggravated criminal sexual assault, a Class X felony. (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a).) The second, section 12—14(b), does not simply enhance the offense of criminal sexual assault to aggravated criminal sexual assault. Rather, it defines the circumstances in which an unlawful act of "sexual penetration," generally treated as criminal sexual assault and punished as a Class 1 felony, will be treated as an aggravated offense and punished as a Class X felony.

An act of "sexual penetration" is treated as the lesser offense of criminal sexual assault when the offender intentionally or knowingly commits the act (1) by the use or threat of force, or (2) knowing that the victim was unable to understand the nature of the act or give knowing consent, or (3) with a victim who is under 18 years of age and the accused is a member of the victim's family or responsible for the victim's welfare. (Ill. Rev. Stat. 1985, ch. 38, pars. 12—13(a)(1), (a)(2), (a)(3).) An act of "sexual penetration" is treated as aggravated criminal sexual assault, and punished more severely, when the offender commits the act and (1) the offender is 17 or older and the victim is younger than 13; or (2) the offender is under 17 and the victim is younger than 9; or (3) the offender is under 17 and the victim is at least 9 but less than 13, and the offender uses or threatens to use force. Ill. Rev. Stat. 1985, ch. 38, pars. 12—14(b)(1), (b)(2), (b)(3).

It is the province of the legislature to define offenses and determine the penalties required to protect the interest of society. (*People v. Steppan* (1985), 105 Ill. 2d 310.) Sections 12—13(a) and 12—14(b) simply reflect the legislature's decision to punish certain acts of "sexual penetration" more severely than others. The legislature may have reasonably decided that an adult offender who commits an act of sexual penetration upon a very young victim should be punished more severely than one who, for example, commits an act of sexual penetration upon an adult victim by the use or threat of force. This court will not interfere with legislation defining the nature and extent of penalties that is reasonably designed to remedy evils which the legislature has determined to be a threat to the public.

## IV

The defendant raises a number of challenges to his sentencing hearing and the death penalty statute. He first contends that he was deprived of his constitutional right to a fair sentencing hearing because the trial judge improperly considered victim impact evidence at the sentencing hearing contrary to the holding of the Supreme Court in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. In *Booth*, the Supreme Court held that a jury's consideration of victim impact evidence at a capital sentencing hearing violates the eighth amendment to the Constitution (U.S. Const., amend. VIII). The evidence consisted of a victim impact statement compiled from interviews with the surviving members of the family of an elderly married couple who had been murdered in their home. The statement contained an extensive summary of the effects of the murders on the family. The Court held that the information was irrelevant in a death penalty hearing and would only divert the jury's attention from its consideration of the

circumstances of the offense and the character and nature of the defendant. The Court noted that the jury's decision as to whether or not to impose the death penalty in a particular case should not turn on the victim's standing in the community or on differences in the willingness or ability of surviving family members to articulate their grief. In addition, the Court feared that any efforts of the defendant to rebut the information in the victim impact statement would distract the jury from its consideration of the offense and the offender. *Booth v. Maryland* (1987), 482 U.S. 496, 503, 96 L. Ed. 2d 440, 448, 107 S. Ct. 2529, 2533.

In this case, the victim impact evidence was introduced at the defendant's sentencing hearing without objection by the defense. The evidence was a typewritten statement signed by Markeeter Hampton, the mother of the victim. In the statement, Ms. Hampton told of the pain she and her family suffered after the murder of her baby. She stated that she was unable to return to work as a counselor at a child care center because it was too painful to be around other children. She also stated that her life was destroyed and that she had "prayed to God" that the trial judge would impose the death penalty. Ms. Hampton also testified at the sentencing hearing regarding the impact of the murder of her baby upon her family.

The State concedes that the use of the victim impact evidence at the defendant's capital sentencing hearing offended the principles of *Booth.* Relying upon this court's decision in *People v. Crews* (1988), 122 Ill. 2d 266, however, the State maintains that the admission of the victim impact evidence in this case was harmless error, because the trial judge did not give weight to the evidence in imposing the death sentence. The defendant responds that this case is factually distinguishable from *Crews,* because the victim impact evidence here was

more extensive than that in *Crews*, because the prosecuting attorney highlighted the evidence in this case, and because the victim's mother testified at the sentencing hearing. He also notes that here, unlike in *Crews*, the trial judge specifically stated that he considered the victim impact statement when sentencing the defendant to death.

In *Crews*, the trial court admitted, without objection from the defense, a brief typewritten statement by the wife of a murder victim, which detailed the pain she and her family suffered as a result of the death of the victim. (*People v. Crews* (1988), 122 Ill. 2d 266, 286-87.) This court held that the error in introducing a victim impact statement at the defendant's capital sentencing hearing was harmless beyond a reasonable doubt. The court explained:

> "The sentencing hearing in this case was conducted before the trial judge alone, the defendant having waived his right to a jury. Although the Supreme Court did not indicate in *Booth* that the rule announced in that case was limited to jury proceedings, we believe that the distinction is important ***." (*Crews*, 122 Ill. 2d at 288.)

The *Crews* court then observed that the prosecuting attorney did not emphasize the victim impact evidence, and that the trial judge did not refer to the victim impact statement when he set forth reasons for sentencing the defendant to death. The court concluded that the admission of the victim impact evidence at the sentencing hearing was harmless error because the trial judge did not rely on the evidence in imposing sentence. *People v. Crews* (1988), 122 Ill. 2d 266, 288.

Here, like in *Crews*, the capital sentencing hearing was held before a judge, the defendant having waived his right to have a jury determine his sentence. Although the *Booth* court presumed that a jury would be adversely affected by the admission of emotional victim impact evi-

dence, such a presumption does not necessarily apply where a trial judge determines whether the defendant's penalty shall be life imprisonment or death. A trial judge is presumed to know the law and to be able to ignore irrelevant, inflammatory or emotional factors in arriving at the court's judgment. (*People v. Morgan* (1986), 112 Ill. 2d 111, 144.) Absent proof to the contrary, a court may presume that a trial judge considered only relevant, material, and competent evidence in deciding whether to impose the death penalty. Where it affirmatively appears in the record that the victim impact evidence did contribute to the trial judge's decision to sentence the defendant to death, however, we may not conclude that the constitutional error was harmless beyond a reasonable doubt. See *Satterwhite v. Texas* (1988), 486 U.S. 249, 100 L. Ed. 2d 284, 108 S. Ct. 1792; *People v. Morgan* (1986), 112 Ill. 2d 111, 144.

Applying these principles here, we cannot conclude that the erroneous admission of the victim impact evidence was harmless beyond a reasonable doubt. The four-page victim impact statement admitted into evidence in this case was more extensive than the one-paragraph statement at issue in *Crews*. In the statement, Markeeter Hampton, responding to a series of questions, described the emotional pain she and her family suffered as a result of the victim's murder, and specifically requested the trial judge to sentence the defendant to death. In addition, Ms. Hampton, unlike the author of the victim impact statement in *Crews*, testified at the sentencing hearing regarding the suffering she and her family endured as a result of the victim's death.

More significantly, the trial judge specifically stated at the sentencing hearing that he had considered the victim impact evidence. Prior to announcing his decision to sentence the defendant to death, the trial judge stated:

"The court has reviewed all the evidence, all of the competent evidence, presented both at the trial and the death penalty hearing. I have considered the presentence investigation, the victim impact statement, the arguments of counsel, the statement of the defendant, and the exhibits, which were offered and both [sic] received during the course of the trial and during the course of the hearing."

The trial judge in *Crews*, on the other hand, engaged in a lengthy recitation of his reasons for imposing the death sentence, but did not refer to the victim impact evidence.

The State maintains that admission of the victim impact evidence in this case was harmless error. The State relies upon remarks the trial judge made at the post-sentencing hearing, more than three months after he sentenced the defendant to death:

"MR. EPOCH [prosecutor]: Judge Suria, having said those things, would it be your finding of fact at this time if Marquita [sic] Hampton had not testified in aggravation your sentence, in fact, would have been the same?

THE COURT: As I have indicated before, without that testimony and without the testimony of the two prior convictions I would have still sentenced Drew Terrell to the sentence of death."

The State argues that the trial court's comments show that the erroneous admission of the victim impact evidence was harmless.

The question, however, is not whether the legally admitted evidence was sufficient to support the death penalty, but whether the State has proved beyond a reasonable doubt that the error complained of did not contribute to the court's decision to impose the death penalty. (*Satterwhite v. Texas* (1988), 486 U.S. 249, 100 L. Ed. 2d 384, 108 S. Ct. 1792.) Given the extensive nature of the victim impact evidence admitted in this case, and the fact that the trial judge expressly stated that he considered the victim impact statement in sen-

tencing the defendant to death, we cannot conclude beyond a reasonable doubt that the error did not contribute to the trial court's decision to sentence the defendant to death. Accordingly, we vacate the defendant's death sentence and remand this cause for a new sentencing hearing upon the defendant's murder conviction.

As we conclude that the defendant's death sentence must be vacated and the cause remanded for a new sentencing hearing, we address only those issues which may arise again. *People v. Fierer* (1988), 124 Ill. 2d 176, 191; see *People v. Wilson* (1987), 116 Ill. 2d 29, 42.

The defendant contends that his death sentence was the result of an impermissible double enhancement. The defendant says that his act of striking the victim with sufficient force to cause her death was used both as the basis for his murder charge, and to enhance the offense of criminal sexual assault to aggravated criminal sexual assault. The defendant contends that the crime of aggravated criminal sexual assault was then used in conjunction with his murder conviction to make him eligible for the death penalty under section 9—1(b)(6) of the Criminal Code. That section makes a defendant who murders a victim in the course of another felony subject to the death penalty. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6).) The defendant submits that, under *People v. Hobbs* (1981), 86 Ill. 2d 242, one factor cannot be used to both aggravate the classification of an offense and aggravate the sentence.

The defendant's reliance upon this court's decision in *People v. Hobbs* (1981), 86 Ill. 2d 242, is misplaced. In *Hobbs*, the defendant's prior felony conviction was used to enhance his second conviction of theft from a misdemeanor to a felony. The prior theft conviction was then used again to sentence the defendant to an extended term under a statute which allowed a court to impose an

extended-term sentence upon defendants with two or more felony convictions within a 10-year period. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)(1).) This court vacated the defendant's extended sentence, concluding that the prior theft conviction could not be used both as the basis for enhancing the defendant's offense from a misdemeanor to a felony, and as the basis for imposition of an extended sentence. The court noted, however, that an extended term could have been imposed if the defendant's second theft, standing alone, had constituted a felony. *People v. Hobbs* (1981), 86 Ill. 2d 242, 245.

In this case, unlike *Hobbs*, the same facts were not used both to enhance the offense of criminal sexual assault to aggravated criminal sexual assault and to enhance the defendant's sentence for murder by making him liable for the death penalty under section 9—1(b)(6) of the Criminal Code. The defendant claims that his act of striking the victim with sufficient force to cause her death formed the basis for his conviction of murder. These same facts, however, did not necessarily form the basis for the defendant's aggravated criminal sexual assault conviction. The fact that the defendant, who was more than 17 years of age, committed an act of sexual penetration upon a victim who was younger than 13 years old was sufficient to sustain his conviction for aggravated criminal sexual assault. The defendant's conviction for aggravated criminal sexual assault would be warranted even if he had not struck or inflicted great bodily harm upon the victim. Unlike the *Hobbs* case, we are not confronted with a situation in which a single aggravating factor, such as striking the victim, constituted both the sole cause of the victim's death and the sole factor to support the finding of murder during the commission of an aggravated criminal sexual assault. As stated, the evidence here supported a finding of aggra-

vated criminal sexual assault without reliance upon the bodily harm which the defendant inflicted upon the victim and which caused her death. Thus, the defendant's sentence was not based upon an impermissible double enhancement. *People v. Phillips* (1989), 127 Ill. 2d 499, 538-41.

The defendant argues that the State failed to prove beyond a reasonable doubt that he murdered the victim "in the course of" a felony, as required for death sentence eligibility under section 9—1(b)(6) of the Criminal Code. The defendant argues that, to prove that a murder occurred "in the course of" a felony, the State must demonstrate beyond a reasonable doubt that the murder was causally connected to the commission of the underlying felony and that the murder was committed to further the commission of that felony. The defendant submits that the evidence demonstrates that he beat the victim because she was crying, and not to permit the sexual assault. He argues that the evidence did not establish that he formed the intent to commit the sexual assault prior to or simultaneously with the beating. Thus, he argues that the evidence does not support the conclusion that he murdered the victim to carry out the sexual assault.

In this case, the forensic pathologist testified that the victim's death was caused in part by the lacerations in her vagina and rectum. The evidence therefore established that the victim's death was caused, not only by the injuries she sustained when the defendant beat her, but also by the injuries she sustained at the time the defendant sexually assaulted her. Thus, the State did not have to prove that the defendant formed the intent to commit the sexual assault prior to beating the child. The evidence clearly proved beyond a reasonable doubt that the victim's death was causally connected to the commission of the underlying sexual assault and that the

defendant murdered the victim "in the course of" the aggravated criminal sexual assault. Accordingly, the defendant's eligibility for the death penalty under section 9—1(b)(6) was proved beyond a reasonable doubt.

The defendant also raises a number of constitutional challenges to the Illinois death penalty (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). The defendant first argues that the aggravating factor set forth in section 9—1(b)(7) of the Criminal Code, which the trial judge used to establish his eligibility for the death penalty here, is unconstitutionally vague. Section 9—1(b)(7) provides that a defendant who has been found guilty of murder may be sentenced to death if:

> "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7).)

The defendant, citing *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, argues that the section is unconstitutionally vague under the eighth amendment. The defendant submits that the language in section 9—1(b)(7) suffers from the same constitutional infirmity as the statute in *Maynard*. We recently considered and rejected this argument in *People v. Odle* (1989), 128 Ill. 2d 111, 138-41.

Moreover, we observe that the trial judge found that two aggravating factors existed in sentencing the defendant to death. First, the defendant murdered the victim in the course of another felony (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), and second, the murdered individual was under 12 years of age and her death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(7)). Therefore, even if it were to be assumed that section 9—1(b)(7) is unconstitutionally vague, the defendant was still eligible for the death penalty under

section 9—1(b)(6). The defendant argues that his death sentence must be vacated and the cause remanded for resentencing if either of the two aggravating factors which made him eligible for the death penalty is invalid. This court recently rejected the same contention in *People v. Coleman* (1989), 129 Ill. 2d 321. In *Coleman*, we noted that our death penalty statute does not place special emphasis on any aggravating factor and does not accord any added significance to multiple aggravating factors as opposed to a single such factor. The finding of an aggravating factor only serves to narrow the class of persons convicted of murder who are eligible for the death penalty. Thus, even if the trial court's reliance on section 9—1(b)(7) were improper, it would not alter the court's finding that the defendant was also eligible for the death penalty under section 9—1(b)(6). The trial court was free in the second phase of the sentencing hearing to consider any relevant and reliable evidence in aggravation and mitigation, including the brutal and heinous manner in which the defendant murdered his victim. (*Coleman*, 129 Ill. 2d at 346; *People v. Emerson* (1987), 122 Ill. 2d 411, 439; *People v. Owens* (1984), 102 Ill. 2d 88, 113.) Thus, the defendant was independently eligible for the death penalty under either section 9—1(b)(6) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)) or section 9—1(b)(7) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7)). *People v. Coleman* (1989), 129 Ill. 2d 321; see *Zant v. Stephens* (1983), 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733.

The defendant argues that the death penalty statute is unconstitutional because it does not require the State to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of death. This argument was rejected in *People v. Kubat* (1983), 94 Ill. 2d 437, and in *People v. Free* (1983), 94 Ill.

2d 378, and the defendant has failed to present new arguments which warrant reconsideration.

The defendant also contends that the death penalty statute is unconstitutional because it gives prosecutors unlimited discretion to choose which defendants will be subject to the death penalty and thus lacks adequate safeguards to prevent the arbitrary and capricious imposition of the death sentence. We have addressed these arguments on several occasions and have concluded that the statute satisfies constitutional guarantees. (See, *e.g.*, *People v. Orange* (1988), 121 Ill. 2d 364, 390; *People v. Erikson* (1987), 117 Ill. 2d 271, 304; *People v. Stewart* (1984), 104 Ill. 2d 463.) The defendant has not presented persuading arguments that warrant reversal of these decisions.

The defendant maintains that the death penalty statute violates the eighth and fourteenth amendments because it bars the sentencer from considering sympathy for the defendant. The defendant cites *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, as support for this argument. This court has considered similar challenges to the constitutionality of the death penalty and has consistently rejected such attacks. See, *e.g.*, *People v. Phillips* (1989), 127 Ill. 2d 499, 543-44; *People v. Britz* (1988), 123 Ill. 2d 446, 479-80; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 42-43.

Finally, the defendant asserts that the death penalty statute is unconstitutional because it does not contain adequate safeguards to prevent the arbitrary and capricious imposition of the death sentence. The defendant raises a number of individual factors which he claims renders the statute arbitrary and capricious. We briefly address each of the individual issues presented. This court has rejected the argument that the statute is unconstitutional because it vests unguided discretionary authority in the prosecutor to seek the death penalty. (*Peo-*

*ple v. Silagy* (1984), 101 Ill. 2d 147, 161-62.) We have also rejected attacks upon the limited comparative proportionality review which this court undertakes. (See *People v. Walker* (1985), 109 Ill. 2d 484, 508.) We have refused to recognize a requirement of written findings by the sentencer. (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41.) We have also rejected claims that the statute is unconstitutional based on an alleged inadequacy of written pretrial notice of evidence to be presented in aggravation. (*People v. Albanese* (1984), 104 Ill. 2d 504, 540.) We have also refused to hold the statute unconstitutional due to an alleged absence of burden of proof on the prosecution to prove aggravation and mitigation factors. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 269.) Finally, we have rejected claims that the statute is unconstitutional because of an alleged absence of a requirement that capital punishment be found to be appropriate. *People v. Free* (1983), 94 Ill. 2d 378; *People v. Spreitzer* (1988), 123 Ill. 2d 1.

We are aware, of course, that a United States District Court judge in the Central District of Illinois held our death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) unconstitutional on the grounds that it gives the prosecutor too broad a discretion whether to ask for the death penalty and lacks adequate notice provisions as to when the death penalty would be sought (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246), claims this court has consistently rejected (see *People v. Silagy* (1984), 101 Ill. 2d 147, 161-62; *People v. Gaines* (1982), 88 Ill. 2d 342, 369). This court in *People v. Del Vecchio* (1989), 129 Ill. 2d 265, commented on this holding:

"We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In

that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may. become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541." *Del Vecchio,* 129 Ill. 2d at 295-96.

Finally, the defendant contends that the trial judge erred in ordering that the defendant's death sentence for murder and 60-year sentence for aggravated criminal sexual assault run consecutively. He argues that only one sentence of imprisonment was imposed and that consecutive sentences are authorized only in the case of multiple terms of imprisonment. Section 5—8—4(a) of the Unified Code of Corrections provides:

"*When multiple sentences of imprisonment* are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to sentence in this State or in another state, or for a sentence imposed by any district court of the United States, the sentences shall run concurrently or consecutively as determined by the court. \*\*\* The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, in which event the court may enter sen-

tences to run consecutively." (Emphasis added.) Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(a).

This court addressed a similar question in *People v. Neal* (1985), 111 Ill. 2d 180. In *Neal*, the defendant argued that an extended-term sentence for armed robbery should not have been imposed because he had been given a death sentence for murder. The defendant argued that an extended-term sentence could be imposed only for the most serious offense for which the defendant was convicted. (*People v. Jordan* (1984), 103 Ill. 2d 192.) The defendant claimed that he could not be given an extended sentence for robbery, because murder is a more serious offense than armed robbery. We held, in *Neal*, that an extended-term sentence for armed robbery was proper, even though the defendant had been sentenced to death for murder, saying:

"The statute authorizing extended terms refers to and is bottomed on, in a sense, the maximum sentences 'authorized by Section 5—8—1,' to which it refers. That section refers to *terms of imprisonment* and does not include capital sentences. Obviously a provision for an extended term of imprisonment would not be applicable to a sentence of death." (Emphasis added.) *Neal*, 111 Ill. 2d at 204.

Although the statute we are discussing authorizes the imposition of consecutive sentences, rather than extended terms of imprisonment, it too concerns a sentence of "imprisonment." Under *Neal*, we hold that a death sentence is not to be considered a term of imprisonment within the meaning of the consecutive sentencing statute. Section 5—8—4(a) authorizes the imposition of a consecutive sentence only where multiple sentences of imprisonment are imposed, or when a single term of imprisonment is imposed upon a defendant already subject to sentence in this State. Because the defendant was sentenced to death and to a term of imprisonment at the

same time, the statute did not authorize the court to order the sentences to run consecutively.

The State argues that the defendant has waived the issue by failing to object at trial. The trial court's imposition of a consecutive sentence without statutory authority is the imposition of a void sentence and does not present an issue subject to the defendant's waiver. (*People v. Singleton* (1984), 103 Ill. 2d 339, 346.) Accordingly, the consecutive sentence imposed by the trial court must be vacated. The cause is remanded to the circuit court of Cook County with directions to impose a sentence not inconsistent with this opinion.

We would observe that our legislature recently amended section 5—8—4(b) to enlarge a court's authority to order consecutive sentences. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b) (amended by Pub. Act 85—1030, §3, eff. July 1, 1988).) As the defendant was sentenced before the statute was amended, the amendment has no application here.

For the reasons given, the defendant's convictions for murder and aggravated criminal sexual assault are affirmed. The sentences imposed are vacated and the cause is remanded to the circuit court of Cook County with directions that sentences be imposed for murder and aggravated criminal sexual assault not inconsistent with this opinion and by a judge other than the judge who imposed the sentences that are now vacated.

*Convictions affirmed; sentences*
*vacated; cause remanded*
*with directions.*

JUSTICE MILLER, concurring in part and dissenting in part:

I concur in the court's judgment affirming the defendant's convictions for murder and aggravated criminal sexual assault. Unlike the majority, however, I do

not believe that a new capital sentencing hearing is necessary in this case, and therefore I dissent from that portion of the majority opinion vacating the defendant's death sentence and remanding the cause for a new sentencing hearing.

The majority believes the trial judge, in a bench proceeding, improperly relied on certain victim impact information in sentencing the defendant to death. The evidence at issue consists of a typewritten victim impact statement prepared by the victim's mother, Markeeter Hampton, and Hampton's testimony at the sentencing hearing. In both her written statement and live testimony, Mrs. Hampton described how her child's murder had affected her, and she asked the judge to sentence the defendant to death for the offense. The State does not dispute that admission of the victim impact evidence would have been barred by the subsequent decision in *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, as a violation of the eighth amendment. Notwithstanding the trial judge's later statement that he would have sentenced the defendant to death even in the absence of the prohibited victim impact information, the majority holds that the *Booth* error was not harmless and that a new sentencing hearing must therefore be conducted. I respectfully disagree.

As the majority opinion correctly recognizes, not every instance of Federal constitutional error in a capital sentencing hearing necessitates a new proceeding. (See *Satterwhite v. Texas* (1988), 486 U.S. 249, 258-59, 100 L. Ed. 2d 284, 295, 108 S. Ct. 1792, 1798 (harmless error rule applicable to erroneous introduction, at capital sentencing hearing, of evidence taken in violation of defendant's sixth amendment right to counsel); *People v. Crews* (1988), 122 Ill. 2d 266, 286-88 (*Booth* error); *People v. Simms* (1988), 121 Ill. 2d 259, 277-78 (Miller, J., specially concurring) (*Booth* error).) With respect to those catego-

ries of Federal constitutional error that may be deemed harmless in an appropriate case, a new sentencing hearing is not required if the State satisfies the standard expressed in *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, and establishes beyond a reasonable doubt that the error complained of did not affect, or contribute to, the sentencing authority's decision. (*Satterwhite*, 486 U.S. at 249, 100 L. Ed. 2d at 295, 108 S. Ct. at 1798; *Crews*, 122 Ill. 2d at 288; *Simms*, 121 Ill. 2d at 276.) Contrary to the majority's holding, I would conclude that the State has met that burden in the present case.

Defense counsel did not object at the sentencing hearing to the introduction of the victim impact evidence, but counsel did raise the issue during the hearing on the defendant's post-sentencing motion. At the latter hearing the following colloquy ensued:

> "MR. EPOCH [assistant State's Attorney]: Judge Suria, having said those things, would it be your finding of fact at this time if Marquita [*sic*] Hampton had not testified in aggravation your sentence, in fact, would have been the same?
>
> THE COURT: As I have indicated before, without that testimony and without the testimony of the two prior convictions I would have still sentenced Drew Terrell to the sentence of death."

In my view, the statement made by the trial judge provides unassailable proof that the victim impact evidence did not contribute to his decision to sentence the defendant to death. Contrary to the defendant's argument, the remarks do not show merely that the judge believed that the remaining evidence was sufficient to sustain the death penalty. Rather, the judge clearly stated that his sentencing decision would have been the same "without *** [the victim impact] testimony." Although the judge did not expressly disclaim reliance on

Mrs. Hampton's typewritten victim impact statement, as distinguished from her victim impact testimony, substantially identical information was presented in both formats, and the defendant makes no contention that the judge's comments may not be interpreted as applying to both. In sum, the trial judge clearly stated that the victim impact information had no effect on his decision to impose the death penalty in the present case. Applying the *Chapman* harmless error standard, I would conclude that the *Booth* violation did not contribute to the sentencing decision.

The majority refuses to accept the trial judge's declaration that the victim impact information played no part in his decision to sentence the defendant to death, relying instead on comments made by the judge during the sentencing hearing. Before imposing sentence the trial judge stated:

> "The court has reviewed all the evidence, all of the competent evidence, presented both at the trial and the death penalty hearing. I have considered the presentence investigation, the victim impact statement, the arguments of counsel, the statement of the defendant, and the exhibits, which were offered and both received during the course of the trial and during the course of the hearing."

The majority believes that the trial judge's remarks demonstrate that the victim impact evidence did in fact contribute to the decision to impose the death penalty. I do not agree.

Treating "consider" as a synonym for "rely," the majority concludes that the judge's consideration of the victim impact information necessarily meant that the evidence affected or contributed to the sentencing decision. The remaining comments made by the judge refute such an interpretation, however. The judge also said that he had considered the arguments of counsel and the defendant's own statement in allocution. That statement does

not show what weight, if any, he assigned to the arguments, or allocution, or any of the other things cited. It is apparent that the judge meant only to express his awareness of the matters presented by the parties, and I would not construe his comments as indicating the effect that the victim impact evidence had on his decision. (*Cf. People v. Simms* (1988), 121 Ill. 2d 259 (new sentencing hearing ordered in light of statement by trial judge acknowledging that he had accorded some weight to victim impact evidence in deciding to impose the death penalty).) Contrary to the majority's understanding, the remarks made by the judge at the sentencing hearing do not impeach his later declaration concerning the effect of the victim impact evidence.

The trial judge's statement at the post-sentencing hearing demonstrates convincingly that the victim impact evidence did not contribute to his decision to impose the death penalty in the present case. I would conclude that any error occurring in the introduction of the victim impact evidence was harmless beyond a reasonable doubt. Accordingly, I do not believe that a new sentencing hearing is required in the present case, and I respectfully dissent from that portion of the majority decision vacating the defendant's death sentence and remanding the cause for another hearing.

JUSTICE STAMOS joins in this partial concurrence and partial dissent.

JUSTICE RYAN, dissenting:

I dissent from the holding of the majority opinion vacating the sentence of death and remanding the cause for a new sentencing hearing. The majority based its holding on the admission into evidence of the victim impact statement. The majority finds that the use of the statement violates the holding of the majority in *Booth*

*v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. However, in *Booth,* the defense counsel had moved to suppress the statement and the trial court had denied the motion. In our case, the defense counsel did not object to the use of the victim impact statement and did not object to its introduction into evidence at the sentencing hearing. Thus, unless the trial judge, before whom the sentencing hearing was being conducted without a jury, wanted to assume the role of the defense counsel, there was no reason for him to exclude the statement.

We do not know why defense counsel made no objection to the use of the statement. It may well be that he was holding this ace up his sleeve, saving it to be used on appeal to achieve the very result reached by the majority opinion—the vacatur of the death sentence and the remand for another sentencing hearing—thus giving him two opportunities, instead of one, to save his client from the death sentence.