# Illinois Official Reports

## Appellate Court

<div style="border:1px solid">

### *People v. Lamonica*, 2021 IL App (2d) 200136

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY LAMONICA, Defendant-Appellant. |
| District & No. | Second District<br>No. 2-20-0136 |
| Filed | July 26, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 19-CF-61; the Hon. George D. Strickland, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael D. Monico and Barry A. Spevack, of Monico & Spevack, of Chicago, for appellant.<br><br>Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Adam Trejo, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1    After a jury trial, defendant, Anthony Lamonica, was found guilty of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2016)) of L.L. The trial court sentenced defendant to 12 years' imprisonment. On appeal, defendant argues that (1) the evidence was not sufficient to prove his guilt beyond a reasonable doubt, (2) the trial court erred by allowing the State to introduce evidence of another alleged offense, (3) the trial court erred by failing to answer the jury's question properly, and (4) defendant received ineffective assistance of counsel.[1] For the following reasons, we reverse.

¶ 2                                    I. BACKGROUND
¶ 3                                      A. Charges
¶ 4    The State charged defendant with aggravated criminal sexual assault (*id.*). The indictment alleged that on or about April 17, 2018, defendant, "[b]y the use of force, knowingly committed an act of sexual penetration of the Victim L.L., in that the said defendant placed his penis in the sex organ of Victim L.L., and in doing so caused bodily harm to Victim L.L."

¶ 5                                       B. Trial
¶ 6    The jury trial was held on September 24 through 26, 2019. L.L. testified as follows. In the fall of 2017, L.L. and defendant met on a dating app. L.L. was 30 years old at the time, and defendant's dating profile indicated that he was 35 years old. L.L. and defendant agreed to meet at a restaurant in Lincolnshire. When they met in the restaurant parking lot, defendant immediately grabbed and hugged L.L. "really hard." L.L. testified that "it was really uncomfortable [and it was] not normal." She "had to kind of push back [and] was like, whoa. Chill out." L.L. knew that defendant was a doctor, and defendant told her that he was a doctor. Defendant encouraged L.L. "to drink a lot" though he knew that L.L. was on medication that would interact with drinking. Throughout the date, defendant made L.L. feel "real uncomfortable." Defendant kept trying to hug and hold L.L. L.L. testified that she thought "this is really weird." L.L. also thought it was weird when, after dinner, defendant suggested they walk to his car so he could drive L.L. to her car, which was parked closer to the restaurant's entrance. L.L. told defendant, "no, like my car is right here," she "said, good night," and the date was over. Defendant contacted L.L. shortly after their date, and L.L. believed that defendant wanted to go out again. They argued about or discussed how she "was uncomfortable." They had no further contact in 2017.

¶ 7    L.L. also testified that, after the first date, defendant sent her five or six messages on the dating app, which L.L. ignored. When defendant sent L.L. another message, in April 2018, she replied and they exchanged phone numbers. During a phone call, L.L. told defendant what made her feel uncomfortable on their first date, and he "seemed very receptive" and apologetic. L.L. agreed to go on another date with defendant on April 17, 2018, at Cooper's Hawk in Wheeling, which L.L. described as a nice restaurant known for its wine tastings. Defendant offered to pick L.L. up and drive her to the restaurant so she would be free to drink, but L.L.

---

[1]Defendant makes four other arguments. However, we need not address these arguments because we reverse on other grounds.

insisted on driving herself and told him that she was not going to drink that much. L.L. also told defendant that he was not "coming back to [her] house."

¶ 8 L.L. met defendant in the Cooper's Hawk parking lot. Once inside the restaurant, defendant suggested that they do a wine tasting. L.L. learned that, contrary to his app profile, defendant was 40 years old and not 35. She accused him of lying, which defendant denied. Before they were seated for dinner, L.L. ordered a wine tasting and drank it. L.L. explained that a wine tasting is about two and one-half glasses of wine. Defendant ordered a bottle of wine for the table and a second bottle when they finished the first bottle. L.L. drank two or more glasses from the first bottle of wine. L.L. testified that defendant "had maybe two or three glasses of the bottles, and I was drinking the majority of it." During dinner, L.L. was very drunk. She did not remember finishing her meal. After dinner, L.L. felt like she was "blacking out" and like she had "probably been drugged or something." She and defendant "were making out in the booth *** kissing a lot, like French kissing all over each other." L.L. testified, "that's nothing I would ever do." L.L. had not intended to drink so much but she was going through stressful personal issues at the time, she felt safe because she was with a doctor, and Cooper's Hawk was her favorite restaurant. At the time, L.L. lived alone with her two dogs in a second-floor apartment.

¶ 9 L.L. drove herself home even though she "wasn't okay to drive." Defendant wanted to drive her home, but she was "scared" to get into a car with defendant so she said no. Defendant called L.L. while she was driving, screaming at her and telling her she was driving erratically. "He was really concerned with me driving." L.L. invited defendant back to her apartment and at one point she might have told him "we would get physical, or we would have sex." L.L. explained, "it is kind of understood when you invite somebody back—you know, you're adults[,] that is probably going to happen. *** If I'm inviting somebody back, I mean, that could happen. *** But, there's no guarantee." L.L. texted her friends in a group chat that she "invited [defendant] over to f*** *** and [she] invited [defendant] over to have sex." L.L. explained, "[w]hen I was describing this to my friends I was taking on the responsibility I invited him back. I mean, we're all adults here. We know what happens when you invite someone back. *** I'm not dumb. I know it is probably going to happen."

¶ 10 L.L. testified that she did not remember what happened when they got to her apartment. But she testified that she went outside with her dogs and fell down. L.L. believed that, after returning to her apartment, she put the dogs in their cages, although she did not remember. The next thing L.L. remembered was being naked with defendant on top of her and he was "trying to like finger [her]." She did not remember how she became unclothed. L.L. testified that defendant "was trying to put his finger inside [her] vagina like rubbing [her] clit." Defendant's manner was forceful and aggressive. Defendant's finger hurt L.L. because she was not "wet." So L.L. indicated with her hands near her vagina that defendant should stop. She told defendant that it hurt. She pushed back a little. According to L.L., defendant said, "shh, no, you're fine." Defendant asked L.L. for lubricant, and she told him that she did not have any. L.L. testified, "then, you know, to make it not hurt, and, you know, I just put his d*** in my mouth probably like two or three times up and down just to get it wet." It was not to pleasure defendant but to "make it not hurt."

¶ 11 L.L. testified that, the next thing she knew, she was flipped over and defendant began having intercourse with her "doggy-style," a position in which L.L. was "on all fours." L.L. testified that she did not remember who initiated that position but in her "head [defendant]

- 3 -

initiated it." Defendant's penis was "inside" L.L.'s vagina, it hurt "really bad," and she started "bawling." L.L. testified that she thought, "oh, my God, he is raping you." She was scared and did not think she could say no. "It felt like he had a knife down there." L.L. did not say anything to defendant at the time. She did not tell defendant to stop or get off of her, but she did tell him that it hurt. Eventually, L.L. "crawled over to the other side of the bed," flipped over on her back, and confronted defendant. L.L. testified,

> "I was like, why are you doing this? Like I do not understand. Why are you hurting me? I am willing to have sex with you. What is going on? Like why are you hurting me? And there was some back and forth, and he was getting upset. You know, he was like I'm not hurting you. I was like, yeah, you are."

¶ 12      L.L. also testified,

> "he starts moving about, and I get sort of worried. He seems like he is getting really upset, and then, you know, we are kind of going back and forth. So, he starts saying he's a doctor. I know your anatomy. You are fine. I am not hurting you. I said, yes, you are. You are hurting me. And then, you know, he is getting really frustrated. Then all of a sudden like *I see a vein in his neck pop*. Like my instincts went like oh, my God, he is like—it was like when someone gets ready to fight or flight. I was like, oh, my God[,] if I do not lay down and shut up, he is going to start hitting me." (Emphasis added.)

L.L. thought, "he is going to hit me or do something violent if I don't." L.L. "said okay. And I laid back down. [Defendant] kept going. *** [He] kept putting his penis in my vagina." L.L. "said, stop. It hurts. And [defendant] said, no, your [*sic*] fine. And I wasn't fine." The penetration was forceful and violent. It was "rough, hard, fast and not like a good rough, hard, or fast." L.L. also testified, "It just felt like he was using a knife. *** It was so painful and like not normal at all." L.L. thought to herself, "you are drunk[, he] is a lot bigger than [me, and y]ou can't defend yourself." L.L. also thought, "just take it because I was afraid to do anything else, but then my body hurt so bad, and the pain was so bad that my body just like instinctively reacted. I shoved him as hard as I could off of me."

¶ 13      L.L. testified that defendant never threatened her, held her down, or grabbed her so hard that she could not release his grip.

¶ 14      L.L. testified that, after she pushed defendant off her, he was holding his penis, which was "so hard," and he asked if he could "finish" on her. L.L. looked at defendant "shocked." Defendant went into the bathroom, where he moaned as he ejaculated into the toilet. Defendant then brought L.L. a glass of water, put his clothes on, and ignored L.L.'s request to talk about the events that just occurred. Defendant asked L.L. to walk him to the door, but L.L. remained on the bed. She asked defendant, "why are you leaving right now." L.L. did not want defendant to stay, rather she wanted him to answer her questions; she was "confused." Defendant left the apartment. L.L., in disbelief, went to the mirror and saw her face covered in smeared makeup from crying "so hard." After L.L. looked in the mirror, she thought, "s*** just went down. This is bad. You were raped."

¶ 15      L.L. also testified that, about 15 minutes after defendant left, she called and texted her friend Bobby. The next day, she called a rape hotline and various hospitals, but she ultimately decided against being examined because, in addition to learning of a lack of availability of female sexual assault nurse examiners, her vagina was in extreme pain. L.L. had to sit on the side of her hip, and it burned when she urinated, feeling similar to a tear or an open wound.

- 4 -

L.L. examined herself and saw that she was really red, puffy, and swollen. L.L. was afraid to go to the hospital, because they would call the police, and she did not want to go through everything a police report would entail. She never went to a hospital, saw a doctor, or underwent a rape kit examination.

¶ 16 L.L. and defendant exchanged text messages a short time after that evening, disagreeing about what happened. Eventually, L.L. called the police after she saw a newspaper article on her phone reporting that defendant had been arrested for another offense. L.L. concluded that she was not the only person whom defendant had violated, that he was a predator who had done this a bunch of times, and that no one gets caught the first two times. L.L. decided that defendant was a rapist. A week or two before she met with the police, she deleted all text messages between herself and defendant from her phone, but she saved screen shots.

¶ 17 The trial court admitted the testimony of E.S. regarding defendant's prior bad acts, pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011), for the purpose of establishing defendant's state of mind and absence of mistake and as other-crimes evidence to establish propensity under section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)).

¶ 18 E.S. testified as follows. In March 2017, E.S. met defendant at a Libertyville restaurant and bar where they were out with separate sets of friends. They exchanged phone numbers, and, at the end of the evening, defendant drove E.S. and one of her friend's home. In April 2018, defendant texted E.S., and she had to be reminded who he was—the doctor from Miami whom she met at the bar about a year earlier. They agreed to go out to dinner. Defendant suggested Cooper's Hawk in Arlington Heights. Defendant picked E.S. up, and they drove together to the restaurant.

¶ 19 E.S. also testified that, when they arrived at the restaurant, she was surprised that their reservation was not until later. Defendant suggested that they do a "flight," "which is eight different tastings of wine," in the wine tasting area. They each consumed their own flight, which amounted to about a glass and half of wine each. When they sat down for dinner, defendant ordered a bottle of wine. They finished the bottle. E.S. did not feel that defendant pushed her to drink more than she wanted. Defendant ordered a second bottle of wine, but they did not finish it. E.S. was becoming intoxicated and would not have felt comfortable driving.

¶ 20 E.S. testified that, at one point, defendant tickled and kissed her, and she kissed him back, but only because they were among a crowd of people and she did not know what else to do. Eventually, E.S. told defendant that she had to go home to feed her dog. On the way to her apartment, they stopped so E.S. could buy cigarettes. When they arrived at E.S.'s apartment, defendant said that he would like to come up to see her dog. They went up to E.S.'s apartment. E.S. testified that she did not want defendant to stay but she did not ask him to leave. They started drinking the bottle of wine from the restaurant. E.S. testified, "I do not know if I wanted him to leave. I just did not want to sleep with him."

¶ 21 E.S. also testified that her neighbor, Honeylyn Dagle, who had been taking care of E.S.'s dog, came up to the apartment with the dog. Dagle let herself in with a spare set of keys. E.S. was on her patio smoking a cigarette. Dagle asked E.S. if she was okay, and E.S. said yes. Dagle left E.S.'s apartment. With defendant still there, E.S. then went into her bathroom, took out her contact lenses, brushed her teeth, and went into her bedroom. She undressed to her bra and underwear, grabbed her dog, and got into bed, but she did not ask defendant to leave. She

told defendant that she was going to bed and thought that he would let himself out or sleep on the couch.

¶ 22 E.S. testified that once she was in bed, she passed out from fatigue and alcohol. During the night, defendant climbed on top of E.S. and removed her bra and underwear. E.S. did not tell defendant no. That night defendant did not try to have sex with E.S. or to touch her inappropriately. When E.S. woke at about 6 a.m., she realized that defendant was naked. E.S. was turned with her back toward defendant. Defendant woke shortly after E.S. and began rubbing, touching, and kissing her neck and back. E.S. told defendant that she did not want to have sex with him. Defendant moved closer to E.S. so that she could feel his stomach and legs on her body, and he asked her why she was afraid of him. He said, "you will like it." E.S. told defendant again that she did not want to have sex. E.S. tried to push defendant away, but he got on top of her. E.S. was on her back, and she could not get him off. Defendant inserted his penis into her vagina. E.S. testified:

> "I mean, I already tried to get away from him, and I already tried vocalizing a bunch of times. I didn't want to. I thought I made myself pretty clear. And so I just at that point I just kind of laid there and just—I mean, he was bigger than me."

Defendant was not holding E.S. onto the bed, but E.S. felt restrained by the weight of his body.

¶ 23 E.S. testified that defendant did not ejaculate inside her. After two or three minutes, defendant moved to change position, and E.S. was able to remove his penis from her vagina and slide out from under him. When E.S. picked her clothes up from the floor, defendant acted confused. Defendant asked E.S. what was going on. "What did I do wrong?" E.S. told defendant that he needed to go right now. E.S. grabbed her dog and went to the balcony patio. E.S. was afraid of defendant, but she did not call the police at the time. E.S. explained, "I didn't think it warranted that. And I didn't want to. I wanted support, but not necessarily police support." When asked by defense counsel, "Are you saying that you didn't think a rape warranted police intervention?" E.S. replied, "I have been down that road before with the Palatine PD before, and I didn't want to repeat to be honest." Although she was fearful of defendant, she did not leave her apartment, because it was her "house, and my dog [was] there, and all my stuff [was] there." While defendant was still in bed and E.S. was on the balcony, she texted Dagle, "I f***ing suck." E.S. explained that "self blame is really common when this happens." E.S. was a social worker trained in sexual assault and sexual harassment. She then texted Dagle, "Please come here," followed by, "he won't leave." E.S. did not text Dagle that she had been raped or sexually assaulted.

¶ 24 E.S. testified that she went into the living room and again told defendant to leave. Defendant argued with E.S. for about an hour, and he would not leave. Defendant alternated between trying to get on E.S.'s good side by telling her how much he cared for her and shaming her by suggesting that she should pay for half of their expensive dinner the previous night. Defendant tried to get E.S. back into the bedroom, but she told him to put on some clothes and just get out. Defendant insisted that it was all a misunderstanding. Dagle then let herself into the apartment, sat down in the living room, and started making conversation with E.S. Defendant, who had been kneeling in front of E.S., stood up, put his shoes on, and put his arms out like he wanted to give E.S. a hug. E.S. told him, "no," and defendant left the apartment. After defendant left, E.S. told Dagle, "Honey, he raped me." Later that day, E.S. went to the hospital and a rape kit was completed. She sustained no injuries. E.S. had no further contact with defendant, but she did see him in court.

¶ 25    Dagle testified as follows. On April 6, 2018, she lived in the same apartment building as E.S. and watched her dog that evening because E.S. went on a date. She received a text message from E.S. at about 11 p.m. and brought her dog back to E.S.'s apartment. Dagle let herself into E.S.'s apartment with a key. E.S. and defendant appeared "intoxicated," and E.S. asked her to stay and have a drink, which Dagle declined. Dagle asked E.S. if she was okay, and E.S. replied, "yes." Then, Dagle left the apartment, went back home, and went to bed. The following morning, Dagle listened to a phone message from E.S. in which she heard E.S. say, "Just leave." Dagle heard no other voice. Dagle let herself into E.S.'s apartment and sat in a chair. E.S. was sitting on the sofa; she was quiet, which was unusual, and she was looking at the floor. Dagle believed that this meant something was wrong. E.S. told defendant to leave; defendant stretched out his arms, and E.S. told defendant, "just leave." Defendant knelt down to put his shoes on, and he left the apartment. Over defense counsel's objection, Dagle testified that, after defendant left, E.S. told Dagle, "Honey, he raped me."

¶ 26    Chenel Vandenberk, a sexual assault nurse examiner, testified that she examined E.S. The court qualified Vandenberk as an expert in her field, without objection. Vandenberk testified that she swabbed E.S.'s vaginal area for DNA. She said that her examination of E.S. did not reveal any injuries but that injuries are found in only 40% of rape cases. Vandenberk testified that it was possible for a person who was sexually assaulted to show no injuries at all. Where there was an injury, it could cause pain while urinating. Further, it was possible for the same penis to cause injuries to one person and no injuries to another person and a finger is more likely to cause injuries than a penis, because a finger is less flexible than a penis.

¶ 27    The parties stipulated that, if called to testify, Illinois State Police forensic scientist, Michelle Bybee-Moody, an expert in DNA evidence, would testify that she examined the vaginal swabs taken from E.S. and that defendant was excluded as a match.

¶ 28    The State rested, and the court denied defendant's motion for a directed verdict.

¶ 29    Defendant called Palatine police officer Robert Patrick, who testified as follows. On April 10, 2018, he spoke with E.S., who reported that defendant sexually assaulted her. E.S. told Patrick that she did not remember much of what happened at her apartment or much of her night with defendant. E.S. told Patrick that she went to bed that night wearing a bra and underwear and woke up wearing the same clothing. She did not say that these items were removed.

¶ 30    During closing argument, the State made the following remarks:

"And when you look at the term 'force'—[L.L.] talked about force. [L.L.] talked about the first thing the Defendant did was force his fingers into her vagina. *** He forced his finger right in there, and it hurt right away.

* * *

And, as [L.L.] said, the defendant is forcing his fingers inside her vagina. She said she wasn't wet. She wasn't ready. So this Defendant—this is pure out force. Pure force.

* * *

[L.L.] was consistent on every single important detail. The elements of the crime— force of penetration, the force, the angry, from the throbbing of the neck, to the anger [defendant] showed, to the force he used ***."

¶ 31    During jury deliberations, the jury asked, "Is 'perceived' threat of force by victim constitute [*sic*] 'threat of force'?" In response to the jury's question, defense counsel requested the trial

court to answer the question, "no" or "in and of itself it's not." The State proposed that the court instruct the jury regarding additional language from Illinois Pattern Jury Instructions, Criminal, No. 11.65C (4th ed. 2000), which states that threat of force includes but is not limited to "when the accused threatens to use force or violence *** and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat." *Id.* Counsel objected to the State's proposed instruction and then requested the court to direct the jury to "refer to the instructions." The trial court then answered the question, "Please refer to the instructions."

¶ 32    The jury found defendant guilty of aggravated criminal sexual assault. On February 13, 2020, the court sentenced defendant to 12 years' imprisonment. Defendant filed a timely notice of appeal on February 14, 2020.

¶ 33                                    II. ANALYSIS

¶ 34    On appeal, defendant first argues that he was not proven guilty beyond a reasonable doubt because the State failed to prove force and the State failed to disprove his affirmative defense of consent. The State counters that the evidence overwhelmingly established that L.L. unambiguously withdrew any consent she had given and defendant continued to sexually penetrate her.

¶ 35                          A. Sufficiency of the Evidence

¶ 36    When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, viewing all the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). This standard of review applies regardless of whether the evidence is direct or circumstantial and regardless of whether the defendant was tried before the bench or a jury. *Id.* When reviewing the evidence, it is not the function of this court to retry the defendant, nor will we substitute our judgment for that of the trier of fact. *People v. Evans*, 209 Ill. 2d 194, 209, 211 (2004). The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that the trial court and the jury saw and heard the witnesses. *Wheeler*, 226 Ill. 2d at 114-15. As such, a jury's findings concerning credibility are entitled to great weight. *Id.* at 115. However, the fact that a judge or a jury accepted the veracity of certain testimony does not guarantee reasonableness. *Id.* "Reasonable people may on occasion act unreasonably," and thus, while a fact finder's decision to accept testimony is entitled to deference, it is neither conclusive nor binding. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Accordingly, a conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Wheeler*, 226 Ill. 2d at 115.

¶ 37    When a defendant raises the affirmative defense of consent, "the State has a burden of proof beyond reasonable doubt on the issue of consent as well as on the issue of force." *People v. Haywood*, 118 Ill. 2d 263, 274 (1987). In order to raise an affirmative defense, the defendant must present sufficient evidence. Sufficient evidence has been described as "slight" or "some" evidence to support the affirmative defense. (Internal quotation marks omitted.) *People v. Everette*, 141 Ill. 2d 147, 156 (1990).

¶ 38 After applying these principles to this case and examining the reasonableness of the evidence in the light most favorable to the State, we determine that the evidence is so unsatisfactory as to justify a reasonable doubt of defendant's guilt.

¶ 39 To prove defendant guilty of aggravated criminal sexual assault, the State was required to prove that defendant committed an act of sexual penetration against L.L. by the use of force and caused bodily harm to L.L. See 720 ILCS 5/11-1.30(a)(2) (West 2016)[2]; see also *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 73. Because defendant raised sufficient evidence of consent, the State was also required to prove that L.L. did not consent to the acts of penetration. 720 ILCS 5/11-1.70 (West 2016).[3]

¶ 40 "The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration." *Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. Force is the essence of the crime of rape. *Id.* Force or threat of force is defined as

> "the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:
>
>> (1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or
>>
>> (2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2016).

¶ 41 Defendant does not dispute that he sexually penetrated L.L. Rather, he contends that the evidence was insufficient to prove that the sexual penetration took place by force. Defendant argues that the testimony was more consistent with a consensual encounter than with one procured by force and that the State failed to disprove consent beyond a reasonable doubt. The State argues that defendant used force three times: (1) when he penetrated L.L.'s vagina with his fingers, (2) when he inserted his penis in her vagina from behind (doggy-style), and (3) when he inserted his penis in her vagina in the missionary position.

¶ 42 The evidence shows that L.L. invited defendant to her apartment to have sex. She could not recall how it started, who initiated it, or how her clothes came off. Defendant tried to stimulate L.L. by using his finger and moving it on her clitoris, but this hurt L.L. so she indicated with her hands to stop. When L.L. pushed defendant back, he stopped, and then she put defendant's penis in her mouth. The State contends that defendant's act of forcing his fingers into L.L.'s vagina was the force necessary to prove criminal sexual assault. However, force does not include the force inherent to the act of physical penetration; instead, there must be some kind of physical compulsion, or threat thereof, that causes the victim to submit to the penetration against their will. *People v. Denbo*, 372 Ill. App. 3d 994, 1005 (2007). Here, there was no evidence that L.L. submitted to defendant's clitoral stimulation due to physical force or the threat of such. To that end, the State failed to prove force beyond a reasonable doubt regarding this act of penetration.

---

[2]This was formerly section 12-14(a)(2) but was amended and renumbered to section 11-1.30 by Public Act 96-1551 (eff. July 1, 2011).

[3]This was formerly section 12-17 but was amended and renumbered to section 11-1.70 by Public Act 96-1551 (eff. July 1, 2011).

¶ 43    Next, we address the State's argument that defendant forced L.L. to have intercourse "doggy style" by penetrating her from behind, while she was on her hands and knees. There was no evidence that defendant used physical force or the threat of physical force to penetrate L.L. while in this position. L.L. did not recall how she came to be "flipped over" and, although she told defendant that it hurt, she did not tell him no or to stop. Further, L.L. was able to move out of that position by crawling away from defendant to the edge of the bed. Thus, the State failed to prove force beyond a reasonable doubt regarding this act of penetration.

¶ 44    We now address the State's contention that defendant forced L.L. to engage in intercourse in the missionary position. The State notes that L.L. testified that she saw a vein in defendant's neck "pop," leading her to believe that, if she "did not lay down and shut up, [defendant] was going to start hitting her." However, defendant did not threaten L.L., and her subjective interpretation of defendant's neck vein as a threat was insufficient to qualify as an actual threat. Under the definition provided in section 11-0.1, an actual threat must be followed by a reasonable belief that the accused will act upon the threat. See 720 ILCS 5/11-0.1 (West 2016). Here, there was no evidence that defendant threatened L.L. or that any perceived threat was reasonable.

¶ 45    The State argues that L.L. withdrew her consent when she told defendant, "stop, it hurts," near the end of the encounter. Defendant argues that, according to L.L.'s testimony, he did not prevent her from disengaging. When a defendant raises the affirmative defense of consent in an aggravated criminal sexual assault trial, the State has a burden of proof beyond a reasonable doubt on the issue of consent as well as on the issue of force. *Haywood*, 118 Ill. 2d at 274. A person can passively force someone to continue with an act of sexual penetration by using one's bodily inertia to prevent the victim from disengaging. *People v. Alexander*, 2014 IL App (1st) 112207, ¶ 54. Here, defendant's bodily inertia did not prevent L.L. from disengaging. Rather, L.L. was able to push defendant off her, ending the penetration. Thereafter, defendant retreated and asked permission to "finish" on her and, when L.L. did not respond, defendant went into the bathroom, brought L.L. a glass of water, got dressed, and left the apartment.

¶ 46    In conclusion, the State failed to prove that L.L. was overcome by "superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2016). L.L. testified that defendant never threatened her, held her down, or grabbed her so hard that she could not release his grip. Further, any fear L.L. had that defendant was going to hit her, because she saw a vein in his neck, was objectively unreasonable and inconsistent with her testimony that she wanted defendant to stay and discuss what had occurred. In addition, L.L.'s perception of threat was not reasonable or sufficient to establish force. The only evidence of force that the State relied on was the force involved in the sex acts themselves and the popped vein in defendant's neck, which L.L. could not reasonably perceive as a threat of force. We note that the State's comments during closing argument, when the State essentially argued that force is the same as penetration, exacerbated the problems with this case. Therefore, we hold that the State failed to prove force or threat of force and failed to disprove defendant's defense of consent by L.L. See *id.* Accordingly, we reverse defendant's conviction of aggravated criminal sexual assault.

¶ 47                                          B. Prior Bad Acts

¶ 48    Defendant argues that the trial court committed reversible error by allowing the State to introduce evidence of another alleged offense. Defendant contends that the court abused its

discretion by admitting E.S.'s testimony because the facts alleged there were too dissimilar to the facts alleged in this case, it was questionable whether defendant committed a crime with E.S., the State spent more time trying to prove the other crime than trying to prove the case on trial, and the prejudicial effect totally outweighed any probative value. The State argues that the prior bad act evidence was necessary to show, *inter alia*, defendant's lack of mistake.

¶ 49    Here, the trial court granted the State's motion *in limine* to admit evidence of defendant's prior bad act regarding E.S., pursuant to Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) and section 115-7.3 of the Code.

¶ 50    Illinois Rule of Evidence 404(b) provides:

"Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith except as provided by sections *115-7.3*, 115-7.4, and 115-20 of the Code ***. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." (Emphasis added and omitted.) *Id.*

Section 115-7.3 of the Code provides:

"(a) This Section applies to criminal cases in which:

(1) the defendant is accused of predatory criminal sexual assault of a child, aggravated criminal sexual assault ***;

* * *

(b) If the defendant is accused of an offense set forth in paragraph (1) or (2) of subsection (a) *** evidence of the defendant's commission of another offense or offenses set forth in paragraph (1), (2), or (3) of subsection (a), or evidence to rebut that proof or an inference from that proof, may be admissible (*if that evidence is otherwise admissible under the rules of evidence*) and may be considered for its bearing on any matter to which it is relevant.

(c) In weighing the probative value of the evidence against undue prejudice to the defendant, the court may consider:

(1) the proximity in time to the charged or predicate offense;

(2) the degree of factual similarity to the charged or predicate offense; or

(3) other relevant facts and circumstances." (Emphasis added.) 725 ILCS 5/115-7.3 (West 2018).

¶ 51    Other-crimes evidence is unquestionably prejudicial to a defendant. Generally, the risk associated with the admission of other-crimes evidence is that it might prove "too much," rendering a fact finder inclined to convict the defendant simply because it believes that he or she is a bad person deserving of punishment. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Courts should avoid admitting evidence that entices a fact finder "to find defendant guilty only because it feels he [or she] is a bad person deserving punishment, rather than basing its verdict on proof specific to the offense charged." (Emphasis omitted.) *People v. Smith*, 406 Ill. App. 3d 747, 751 (2010). Our supreme court has urged trial courts "to be cautious in considering the admissibility of other-crimes evidence to show propensity by engaging in a meaningful assessment of the probative value versus the prejudicial impact of the evidence." *Donoho*, 204 Ill. 2d at 186. The trial court's decision to admit or deny other-crimes evidence to show the defendant's propensity to commit sex offenses will not be disturbed absent an abuse of

discretion. *Id.* at 182. A trial court abuses its discretion where its ruling is arbitrary or fanciful or where no reasonable person would take the view adopted by the court. *Id.* Generally, " '[i]f other crimes evidence is admitted, it should not lead to a mini-trial of the collateral offense; the court should carefully limit the details to what is necessary to illuminate the issue for which the other crime was introduced.' " *People v. Walston*, 386 Ill. App. 3d 598, 619 (2008) (quoting *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995)). Though there are no explicit statutory factors directed toward assessing the undue prejudice of more thorough other-crimes evidence, trial courts may consider the additional undue prejudice caused by the more thorough evidence and the likelihood that the more thorough evidence will distract the jury or unduly prolong the trial. *Id.* at 622.

¶ 52    Here, the prejudicial effect of introducing the other-crimes evidence cannot be overstated. The State presented one witness, L.L., to prove the instant offense and three witnesses to establish that defendant committed one prior bad act. Further, regarding the element of force, L.L.'s testimony was inconsistent about whether she viewed defendant as a physical threat; thus, it confused the jury. During deliberations, the jury asked if "perceived threat of force by a victim constitute[s] threat of force?" As explained below, E.S.'s unproven allegation was factually dissimilar to the charged conduct. Thus, the probative value was low, and no reasonable person could conclude that the probative value outweighed the prejudicial effect.

¶ 53    We are mindful that, as factual similarities increase, so does the relevance or probative value of the other-crimes evidence. *Donoho*, 204 Ill. 2d at 184. Conversely, as the dissimilarities increase, so does the prejudicial effect of the other-crimes evidence. *Smith*, 406 Ill. App. 3d at 753-54. Here, L.L. testified that defendant penetrated her in the evening, after their date, while she was drunk. E.S. testified that, after her date with defendant, she went into her bedroom, got undressed, and went to sleep and that defendant forcefully penetrated her in the morning while she was sober. L.L. testified that defendant put his finger in her vagina, he penetrated her from behind, he masturbated in the bathroom, and he quickly left her apartment. E.S. testified that defendant forcefully penetrated her while on top of her and stayed for about an hour after the alleged assault and wanted to talk to E.S.

¶ 54    Other than defendant inviting E.S. and L.L. to wine bars, the two incidents bear little resemblance to one another in any significant way. Because the similarities were low, E.S.'s allegations were unproven, and the State presented three witnesses to establish the alleged prior bad act, the risk of undue prejudice to defendant clearly outweighed the probative value, particularly in light of the extensiveness of the evidence presented on the incident with E.S. In addition, the number of witnesses was not necessary to prove lack of mistake. Other-crimes evidence should not take up most of a trial. It is a practice that should be shunned. If other-crimes evidence is admitted, the State should avoid putting on " 'a trial within a trial' " on the other crime. *People v. Cavazos*, 2015 IL App (2d) 120444, ¶ 70. Accordingly, the trial court abused its discretion in admitting the other-crimes evidence.

¶ 55                                C. Jury's Question

¶ 56    Next, defendant argues that the trial court erred by failing to answer the jury's question, "Is 'perceived' threat of force by victim constitute [*sic*] 'threat of force'?" However, we need not discuss this issue, because we have already determined that the State failed to prove defendant guilty beyond a reasonable doubt of the charged offense.

- 12 -

## D. Ineffective Assistance of Counsel

Defendant argues that he was denied effective assistance of counsel where defense counsel (1) failed to object to the prosecutor's *voir dire* questions, (2) failed to perfect impeachment of L.L., and (3) failed to object to the prosecutor's misleading comments during closing argument. Because of our determination that the evidence was insufficient, these claims are moot.

## III. CONCLUSION

The judgment of the circuit court of Lake County is reversed.

Reversed.