2024 IL App (1st) 230488-U

No. 1-23-0488

Order filed August 12, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 8091 |
| | ) | |
| PABLO HERRERA, | ) | Honorable |
| | ) | Lauren Gottainer Edidin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for criminal sexual assault is affirmed over his contentions that (1) the victim's testimony did not establish beyond a reasonable doubt that he should have known his penetration of her was by force or the threat of force and (2) the trial court erred in crediting the State's closing argument that his failure to schedule an interview with a detective suggested consciousness of guilt.

¶ 2    Following a bench trial, defendant Pablo Herrera was found guilty of criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2012)) and sentenced to six years in prison. On appeal, defendant challenges the sufficiency of the evidence, contending that the victim's testimony did

not establish beyond a reasonable doubt that his penetration of her was by force or the threat of force. Defendant further contends that the trial court plainly erred in crediting the State's closing argument that his failure to submit to an interview with a detective suggested consciousness of guilt. For the reasons that follow, we affirm.

¶ 3     Defendant's conviction arose from the events of April 7, 2012. Following his arrest, defendant was charged by indictment with aggravated criminal sexual assault, criminal sexual assault, and aggravated criminal sexual abuse. All of the charges alleged that defendant knowingly committed an act of sexual contact between his penis and D.M.'s anus "by the use of force or threat of force."

¶ 4     At trial, D.M. testified that, on September 5, 2011, her father drove her to the West Chicago Metra station and waited for her to board a commuter train into Chicago for a regional sorority meeting. After D.M. arrived at the platform, she realized she had missed her train. Defendant approached her and introduced himself as "Paolo Faviani." He told her he attended her church and had gone to her high school. Defendant offered D.M. a ride to Chicago, indicating his female cousin was on her way to pick him up. D.M. felt comfortable with the idea because the cousin was female.

¶ 5     While D.M. was telling her father that defendant had offered her a ride, he approached and introduced himself to her father as "Paolo Faviani." Defendant shook her father's hand, gave him a business card, and assured him D.M. would be safe. D.M. agreed to go with defendant and his cousin arrived about five minutes later.

¶ 6     Defendant's cousin drove defendant and D.M. to Chicago and dropped D.M. off at a Chicago Transit Authority (CTA) station. Before D.M. got out of the car, she and defendant exchanged Facebook contact information. His profile listed his name as "Paolo FaViani."

¶ 7     After her sorority meeting, D.M. messaged defendant on Facebook, commenting that it was a "small world" because they had missed the same train at the same time to the same destination. Defendant asked whether she had made it to her meeting on time and suggested that they meet for "coffee or apple juice." D.M. responded that maybe they would run into each other again on the Metra.

¶ 8     Over the next several months, defendant and D.M. sporadically exchanged messages on Facebook. She gave defendant her phone number but they did "[n]ot really" communicate via phone. They "bumped into" each other several times on the Metra, but their in-person exchanges were "[n]othing more than a hi, bye." In March 2012, D.M.'s sorority was holding its annual fundraiser banquet. In a "last push" to sell her quota of tickets, she sent a mass text to her phone contacts, including defendant. Defendant attended the banquet, but they did not sit together or interact that night. Afterwards, she reached out to thank him for attending, as she was extremely grateful that he had gone out of his way for her twice.

¶ 9     Defendant continued asking D.M. if she wanted to get together. She eventually agreed to meet defendant at the Addison CTA station on April 6, 2012. Defendant said he could not meet until 11 p.m. D.M. asked several friends to join them because she "still really didn't know this guy." When none of her friends were available, D.M. went alone because she had already committed to doing so.

¶ 10    Defendant arrived at the CTA platform carrying a "bulky" bag. He tried to greet D.M. by kissing her on the lips, but she ducked because she did not want to kiss him. She thought the gesture was "weird" because they were on a "friendly meet-up," not a date. They walked to a nearby bar and defendant asked D.M. what she wanted to drink. She requested an amaretto sour, but he ordered her a Long Island iced tea. Before they left, defendant bought D.M. an amaretto sour. Later, they went to a second bar and defendant bought D.M. a "bright blue drink."

¶ 11    D.M. avoided multiple attempts by defendant to kiss her throughout the evening. She let him kiss her after she drank the blue drink because she thought he would stop if she just let him give her a "peck" on the lips.

¶ 12    Shortly after 2 a.m., defendant and D.M. left the second bar. D.M. intended to return to her Northwestern University dormitory alone. Defendant told her that the Metra trains had stopped running and he had nowhere to go. After an awkward silence, D.M. said defendant could stay at her dormitory. Although she did not want defendant to stay there, she "was trying to be nice *** [figuring] if he's got nowhere else to go, *** [she] didn't want to be rude."

¶ 13    When they arrived at her dormitory, defendant checked in as a guest with the security guard using an identification card. D.M. had a single-person dormitory room, containing a bed that was smaller than a twin size. The bathroom, which she shared with other residents, was in the hallway. When they got to her room, defendant put his bag down and pushed her onto the bed. D.M. got up, telling herself, "[D]on't be rude, don't call attention to it. It's okay. He's harmless. He's fine."

¶ 14    After D.M. gave defendant a t-shirt and shorts, he started changing in front of her. D.M. was a "little shocked" and looked away. She left her room and changed into a t-shirt and yoga pants in the bathroom. When she returned, she gave defendant a pillow and a blanket, which he

put on the floor. After setting the alarm for defendant, D.M. said good night. Defendant was on the floor when D.M. went to sleep alone in her bed.

¶ 15    Later that night, D.M. woke up when she felt "defendant lying right behind [her]" thrusting his body into her. She realized that her "yoga pants and [her] underwear were at knee level." D.M. was confused, "trying to figure out what was going on." After telling defendant to stop, D.M. took her hand and "tried to push against his hips to move him away from [her], but [she] wasn't strong enough. He kept thrusting." D.M. felt pain from defendant inserting his penis in and out of her butt. As D.M. kept trying to push defendant away, he grabbed her hand and "repositioned it for [her] to feel the base of his penis." Defendant made D.M. feel his penis while she was telling him to stop. Defendant stopped eventually, but not immediately. D.M. was in "complete shock trying to figure out what the heck is going on." Defendant told her she "was lucky because some of his friends wouldn't have stopped."

¶ 16    As she laid in bed "trying to process what had just happened," defendant started apologizing. Defendant kept "saying he was sorry and *** [she] didn't respond. [She] was just lying there just stunned." Defendant told D.M. he "just couldn't help [himself]." D.M. felt numb, overloaded, and "in absolute shock." She remembered staring at the ceiling and then rolling over because all she wanted to do was go back to sleep. She moved as close as she could to the wall, pulled up her blanket, and fell asleep.

¶ 17    The next thing D.M. remembered was the alarm going off. She sat up and looked at the ground as defendant, who had changed and picked up his bag, asked for directions to the CTA. D.M. walked defendant to the dormitory exit and told him how to get to the purple line. After defendant left, D.M. texted him, "I hope you understand when I ask that we never speak again. I

have lost the trust that I had in you." He wrote back, "So we are not to ever speak again…?" D.M. responded, "I don't think I'd want to, no."

¶ 18 D.M. went back to her dorm and went to sleep. When she woke up, it was dark, and she realized she had slept all day. Her anus was sore and bleeding when she went to the bathroom. She realized she could not continue pretending nothing had happened and needed to "do something."

¶ 19 D.M. Googled the phrase "sexual assault," called a confidential crisis hotline and the Northwestern Health Clinic emergency line. She also contacted Northwestern University police and asked what to do if she had been sexually assaulted. She was told she could come to the station or they could send a squad car to pick her up.

¶ 20 While walking to the police station, D.M. sent defendant two text messages. The first was, "I can't believe you took advantage of me like that. You are lucky you stopped when you did." In the second, she asked defendant if he realized what he did. Defendant did not respond to either text. After talking to detective Katarzyna Kramarz, D.M. was taken to the hospital, where she was examined and a criminal sexual assault kit was conducted.

¶ 21 Dr. Sari Hart testified that, in the early morning hours of April 7, 2012, she treated D.M. in the emergency department at Evanston Hospital. D.M. stated she had been asleep the previous evening and woke up to a male friend penetrating her anus with his penis. She had not showered and was wearing the same underwear, but had "moved her bowels since then."

¶ 22 Hart observed a two-centimeter tear of the skin adjacent to D.M.'s anal sphincter and found the area was tender to touch. D.M. reported that she had been bleeding and was in pain. Hart testified that two centimeters equaled "approximately an inch," that a "two-centimeter tear next to the anus is a large tear," and that D.M.'s tear was consistent with penetration and with "assault to

that region." She believed D.M.'s injury was caused by trauma or force. Hart estimated that she had examined about 100 sexual assault patients in her career and, based on her experience, while there "often is no evidence of physical injury *** in this case there was very significant evidence." Hart conducted a criminal sexual assault kit, which included taking anal swabs.

¶ 23 Northwestern University police detective Katarzyna Kramarz testified that, on April 7, 2012, she interviewed D.M., who related that "Paolo Faviani" sexually assaulted her in her dorm room. Kramarz also reviewed the dormitory's visitor log, showing that defendant had given the security officer an Illinois driver's license indicating his name was "Pablo Herrera."

¶ 24 That week, D.M. did not attend her sorority conference or her classes. She met with the campus priest and spoke with a university counselor. The next weekend, she went home to visit her parents. As her parents were driving her back to school on Sunday night, D.M.'s mother asked if there was something she wanted to tell them. D.M. started crying and told them what happened. After talking with her parents, she decided to pursue pressing charges.

¶ 25 On April 16, 2012, D.M. informed Kramarz that she wanted to pursue charges against defendant. The next day, Kramarz presented D.M. with a photo array of six men. D.M. identified defendant as the man who sexually assaulted her.

¶ 26 Kramarz called defendant, identified herself as a Northwestern University police detective, and told him he was a suspect in a criminal sexual assault investigation. She asked him to meet her at the police station and gave him the address. Defendant told Kramarz that he was at work and unable to meet with her. He further stated that he was going to be out of town for the next few days, but would call her to schedule an interview. Defendant never called Kramarz. On cross-examination, Kramarz agreed that defendant said he was willing to meet with her and that she had

been contacted by a lawyer who indicated "that nothing was going to happen until [the lawyer] was present."

¶ 27    Northwestern University police detective-sergeant Latori Bartelle testified that in 2015 and 2016, defendant was a suspect, but was not in custody because investigative steps to locate him had been unsuccessful. Arrangements were made for defendant to turn himself in on October 29, 2015, but he failed to appear. An arrest warrant was issued on November 3, 2015. After a number of failed attempts, defendant was arrested on April 21, 2016.

¶ 28    Dr. Cynthia Lischick testified as an expert "in the area of sexual assault and abuse, victim behavior and trauma response." She explained that in response to being sexually assaulted, victims may react by fighting, trying to run away, or freezing and "at least temporarily trying to figure out what's happening." She testified at length about "acquaintance rape," describing its dynamics and the behaviors of its perpetrators and victims. Among other things, she explained that a victim may continue to have contact with a perpetrator as she processes "betrayal trauma," and that it would not be surprising if a victim fell asleep after being assaulted by someone she knew, as the "frontal lobe sort of shuts itself off."

¶ 29    The parties stipulated that no semen was detected on the anal swabs taken from D.M. and there was insufficient human male DNA on the swabs for further analysis.

¶ 30    After defendant's motion for a directed finding was denied, the State rested and defendant recalled D.M. as a witness "for recommittal and credibility." She testified consistently with her prior testimony. Defendant elected not to testify, and the defense rested.

¶ 31 In closing, the State argued that defendant's conduct was calculated, manipulative, and designed to instill "a false sense of security." The State also summarized its expert's testimony on acquaintance rape, arguing that defendant's behavior was "textbook."

¶ 32 Regarding defendant's failure to follow up with detective Kramarz, the State argued:

"What about the defendant's actions regarding Detective Kramarz? Detective Kramarz calls the defendant and tells him, you are the subject of a sexual assault investigation. We need you to come in and speak with us, and he has the audacity to tell them he's at work, he's not available, I'm going out of town, I'll give you a call back when I get back into town. Are you kidding me? And then he never does. He never calls back. He never shows up. What kind of person never inquires about the fact that they're the subject of a rape investigation unless they know they're guilty?"

¶ 33 Defense counsel argued that defendant did not commit a crime or do anything wrong. Counsel highlighted the absence of eyewitnesses other than D.M., the lack of DNA evidence, contemporaneously recorded statements by D.M., confessions by defendant, or testimony of outcry witnesses. Counsel also argued that D.M. was not naïve, critiqued the testimony of the State's expert, pointed out that defendant did not isolate D.M. or hide his identity at the dormitory, and attacked D.M.'s credibility.

¶ 34 Concerning detective Kramarz, counsel argued:

"He has a right to counsel. He has a right to due process. And for them to insinuate that being at work and not running to the police station because they have investigatory alerts is an admission of guilt is preposterous, ridiculous, and a perversion of the system."

¶ 35 In finding defendant guilty of criminal sexual assault and not guilty of aggravated criminal sexual assault and aggravated criminal sexual abuse, the court stated, as follows:

"I have listened to the testimony of the witnesses, reviewed my notes, and had the opportunity to review the transcripts. Victims are unique, and when put in a situation, each one can act differently. This is a case of evidence and credibility, and the victim was never impeached. There was sufficient evidence to prove the defendant guilty beyond a reasonable doubt without considering the expert's testimony. The State proved the defendant [guilty] beyond a reasonable doubt of criminal sexual assault."

¶ 36 Following a hearing, the court denied defendant's motion for a new trial, finding, *inter alia*, that D.M.'s testimony was credible and unimpeached. On October 12, 2018, the court sentenced defendant to six years in the Illinois Department of Corrections.

¶ 37 On appeal, defendant challenges the sufficiency of the evidence to sustain his conviction.

¶ 38 When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). "A reviewing court must allow all reasonable inferences from the record in favor of the State" (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)), and the positive and credible testimony of a single witness is sufficient to convict (*People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009)).

¶ 39 It is the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts in the evidence, and to draw reasonable inferences from the evidence, and a reviewing court will not substitute its judgment for

that of the trier of fact on these matters. *People v. Gray*, 2017 IL 120958, ¶ 35. Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)) or where proof of an element of a crime is wholly lacking (*People v. Sweigart*, 2021 IL App (2d) 180543, ¶ 56).

¶ 40    As charged in this case, a person commits criminal sexual assault if he commits an act of sexual penetration and "uses force or threat of force." 720 ILCS 5/11-1.20(a)(1) (West 2012).

¶ 41    Defendant does not dispute that he sexually penetrated D.M., but argues that the evidence did not establish beyond a reasonable doubt that he penetrated D.M. by force or the threat of force. Defendant acknowledges that D.M. pushed her hand against him but argues that "this isolated action was not enough to make it clear to a reasonable person that the penetration was against her will; indeed, [he] guided her hand to his penis but did not try to keep it there, as though he thought she was attempting to fondle his body." He claims he stopped penetrating D.M. after she said "[s]eriously, stop," arguing that no reasonable factfinder could conclude he should have known his penetration was against D.M.'s will before he stopped.

¶ 42    Per statute, a person knows, or acts knowingly or with knowledge of the nature or attendant circumstances of his conduct "when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist." 720 ILCS 5/4-5(a) (West 2012). In addition, "[k]nowledge of a material fact includes awareness of the substantial probability that the fact exists." *Id.* Knowledge is often proven by circumstantial evidence because it is the mental element of an offense and, as such, is rarely proven by direct evidence. *People v. Leib*, 2022 IL 126645, ¶ 37.

¶ 43   " 'Force or threat of force' means the use of force or violence or the threat of force or violence, including, *** situations: *** when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." 720 ILCS 5/11-0.1 (West 2012). The force necessary to prove criminal sexual assault "requires something more than the force inherent in the sexual penetration itself." *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 38. However, no definite standard exists as to the amount of force the State must prove, and each case must be considered on its own facts. *Id.* In addition to the size and strength of the defendant and the victim, relevant considerations include the place and conditions under which the incident occurred. *Id.* Whether force or threat of force was used is a question best left to the trier of fact, who heard the evidence and observed the demeanor of the witnesses. *Id.*

¶ 44   D.M. testified that when she woke up in her small bed, she was facing the wall and defendant was behind her, "thrusting" his penis in and out of her anus. With her left hand, she felt that her yoga pants and underwear were pushed down to her knees. She also felt defendant's leg. She told him to stop and used her hand to push against his hip to try to move him away from her, but she "wasn't strong enough." As she kept trying to push defendant away, he kept thrusting. He then grabbed her hand and moved it to the base of his penis and "made [her] feel it." D.M. told him, "Seriously, stop" and removed her hand from his penis. Defendant "eventually stopped." See *People v. Edwards*, 2022 IL App (1st) 200308-U, ¶ 30 (force may be established by nothing more than the assailant's use of superior strength or size to render the victim powerless to stop him); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 45    D.M.'s uncontradicted testimony established that she told defendant to stop and tried to push against his hips to move him away, but was not strong enough to do so. After disregarding her verbal requests to stop, defendant used his superior strength to continue his thrusting penetration. Defendant also thwarted D.M.'s attempt to physically resist by grabbing the hand she was using to disengage from him and moving it to his penis. It was only after she told him again to stop and removed her hand, that he eventually stopped penetrating her. In addition, Dr. Hart opined that the uncommonly large size of the two-centimeter "large tear" next to D.M.'s anus indicated that the injury was caused by force.

¶ 46    Viewing the evidence in the light most favorable to, and taking all reasonable inferences in favor of, the State, as we must, we find that the evidence was sufficient for the trial court to reasonably conclude that defendant used force when he penetrated D.M. See *People v. Alexander*, 2014 IL App (1st) 112207, ¶¶ 54, 56 ("ample evidence of force" existed where the victim woke up on her stomach, with the defendant lying on her back, penetrating her, and he used his position and weight to continue the act of penetration while she attempted to push him away); *Edwards*, 2022 IL App (1st) 200308-U, ¶¶ 31, 32, 34 (although the victim did not resist, finding that the defendant used force "by exploiting his size and strength advantages over a teenage girl and by attacking her in her sleep, when she was at her most vulnerable"); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 47    Regarding the mental state necessary to sustain a criminal sexual assault conviction, Illinois courts have found that a mental state of intent or knowledge is implicit in offenses involving sexual penetration. See, *e.g.*, *People v. Terrell*, 132 Ill. 2d 178, 209 (1998); *People v. Burton*, 201 Ill.

App. 3d 116, 121 (1990). However, the issue is generally whether *penetration* is committed with intent or knowledge, not whether the defendant intentionally or knowingly uses force. Here, there is no question that the penetration occurred with intent or knowledge, as opposed to accidentally or unintentionally. See *Terrell*, 132 Ill. 2d at 210-11.

¶ 48    Our research has revealed no cases discussing whether the State is required to prove that a defendant should have known his penetration was by force. Assuming, *arguendo*, that it must, the evidence in this case was sufficient for a reasonable trier of fact to find that defendant should have known his penetration of D.M. was by force.

¶ 49    The fact that defendant began penetrating D.M. while she was still asleep is circumstantial evidence that defendant knew he was using force. See *Edwards*, 2022 Il App (1st) 200308-U, ¶¶ 8, 10, 11, 34 (finding force where the defendant penetrated the victim while she was asleep, "knowing full well that [she] had no realistic hope of stopping him"); Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes). Once awake, D.M. told defendant to stop and tried to push him away, but was not strong enough to disengage. After telling defendant to stop, both verbally and physically, he grabbed the hand she was using to push him away and made her touch his penis while he continued thrusting in and out of her anus. Under these circumstances, the evidence was sufficient to prove that defendant was "consciously aware" that he was using force to achieve penetration of D.M. See 720 ILCS 5/4-5(a) (West 2012) (a person knows, or acts knowingly or with knowledge of the nature or attendant circumstances of his conduct, as described by the statute defining an offense, "when he or she is consciously aware that his or her conduct is of that nature or that those circumstances exist").

¶ 50 We are not persuaded by defendant's reliance on *People v. Denbo*, 372 Ill. App. 3d 994 (2007) and *People v. Lamonica*, 2021 IL App (2d) 200136, both of which are distinguishable from the instant case. Unlike in *Denbo* and *Lamonica*, D.M. and defendant were not dating and D.M. did not consent to sexual activity with defendant. In addition, unlike the complainants in *Denbo* and *Lamonica*, when D.M. "figure[d] out what was going on," she told defendant to stop, tried to push him away, and was unable to disengage.

¶ 51 Defendant also argues that the trial court erred in crediting the State's closing argument that defendant's failure to submit to an interview with detective Kramarz suggested consciousness of guilt.

¶ 52 Defendant acknowledges that Kramarz's testimony about her phone conversation with him was probative to establish that he knew he was a suspect in a criminal investigation and relevant because multiple attempts to execute his arrest warrant had failed. However, he claims that "the State urged that Detective Kramarz's testimony about her call was probative in a far different way: that [defendant's] failure to speak to the police without an attorney was a tacit admission of guilt by silence." Defendant maintains that the argument was an improper use of the "tacit admission" rule, and that the trial court "plainly erred in considering the State's argument that [his] communication with the [police] through counsel demonstrated consciousness of guilt."

¶ 53 Although defendant did not preserve this issue for appellate review, he urges us to reach the issue under the plain error doctrine because the evidence in his case was closely balanced.

¶ 54 Under the plain error doctrine, a reviewing court may consider an unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the

error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before we consider application of the plain error doctrine, we must determine whether any clear or obvious error occurred. *People v. Reese*, 2017 IL 120011, ¶ 60. This is because " 'without error, there can be no plain error.' " *People v Wooden*, 2014 IL App (1st) 130907, ¶ 10 (quoting *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)).

¶ 55    Defendant asserts that the trial court erred in "crediting" or "considering" the State's improper use of the tacit admission rule. Under this rule, a "defendant's silence may be introduced as a tacit or implied admission of his guilt if he remained silent in the face of an incriminating statement painting or portraying him as a participant in illegal and prohibited activity." *People v. Allen*, 2022 IL App (1st) 190158, ¶ 72. The rule is valid in Illinois, but should be "received with caution" due to the inherently ambiguous nature of the inference and because silence may be motivated by many factors beyond a sense of guilt or the lack of an exculpatory story. *People v. Ruiz*, 2019 IL App (1st) 152157, ¶¶ 36, 37. For a tacit admission to be admitted, the following elements must be met: (1) the defendant heard the accusative statement, (2) the defendant had an opportunity to reply and remained silent, and (3) the accusation was such that the natural reaction of an innocent person would be to deny it. *Id.* ¶ 35. Defendant claims that the State's remark was an improper use of the rule because his response to Kramarz was not probative of guilt. He argues that seeking legal representation is an entirely natural reaction when an innocent person learns he is a suspect in a criminal investigation.

¶ 56 Trial judges are presumed to know the law, to recognize and disregard improper arguments made to them, and to consider only competent evidence in ruling on the merits of cases. *People v. Bowen*, 241 Ill. App. 3d 608, 621 (1993). The presumption that a trial judge knows the law is overcome only when the record affirmatively demonstrates the contrary. *Id.* at 621-22. Therefore, where counsel makes improper arguments or remarks, we will not reverse "unless it affirmatively appears that the court was misled or improperly influenced by such remarks" and that the arguments or remarks resulted in a judgment contrary to the law and the evidence. *People v. Mays*, 81 Ill. App. 3d 1090, 1097 (1980); see also *People v. O'Malley*, 108 Ill. App. 3d 823, 829 (1982) (affirming where there was "nothing in the record to indicate that the trial court relied upon any alleged improper argument in reaching its finding").

¶ 57 Here, in finding defendant guilty, the trial court specifically stated it was basing its decision on "evidence and credibility," that D.M. was "never impeached," and that "[t]here was sufficient evidence to prove the defendant guilty beyond a reasonable doubt without considering the expert's testimony." Similarly, in denying defendant's motion for a new trial, the trial court reiterated that "[t]his is a case of evidence and credibility."

¶ 58 Thus, even assuming, *arguendo*, that the State's closing argument was improper, nothing in the record affirmatively indicates that the court was "misled or improperly influenced" by those remarks in determining defendant's guilt. See *O'Malley*, 108 Ill. App. 3d at 829; *Mays*, 81 Ill. App. 3d at 1097. It follows that the trial court did not commit a clear or obvious error. Since the plain error doctrine does not apply, defendant has forfeited review of this issue.

¶ 59 For the reasons set forth herein, we affirm the judgment of the circuit court.

¶ 60 Affirmed.